Martina Vansice STUHLER, Appellant,

v.

The STATE of Texas.

No. PD–1723–05.

Court of Criminal Appeals of Texas.

Jan. 24, 2007.

Rehearing Denied April 4, 2007.

---

Cary Piel, Denton, for Appellant.

Kathleen A. Walsh, Asst. Crim. Dist. Atty., Denton, Matthew Paul, State's Attorney, Austin, for State.

## *OPINION*

PRICE, J., delivered the opinion of the Court, in which MEYERS, JOHNSON, HOLCOMB and COCHRAN, JJ., joined.

The appellant was convicted by a jury of the first degree felony offense of injury to a child and sentenced to sixty-five years' confinement in the penitentiary and a fine of $10,000. The jury was instructed in the same application paragraph that it could convict the appellant should it find, alternatively, either that she caused the victim serious bodily injury, or that she caused him serious mental deficiency, impairment, or injury.[1] On appeal, the Fort Worth Court of Appeals reversed the conviction, holding in an unpublished opinion that the evidence was insufficient to support the conviction on the basis of serious bodily injury, and remanding the cause for a new trial on the alternative theory that the appellant caused serious mental deficiency, impairment, or injury because the jury charge, which had authorized conviction alternatively under *either* theory, erroneously authorized a non-unanimous jury verdict.[2] We granted the State's petition for discretionary review to examine the

1. TEX. PEN.CODE § 22.04(a)(1) and (2)("A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual ... serious bodily injury [or] serious mental deficiency, impairment, or injury[.]").

2. *Stuhler v. State*, (Tex.App.-Fort Worth, No. 2–04–208–CR, 2005 WL 2402686, delivered September 29, 2005).

court of appeals' conclusions both that the evidence was legally insufficient to prove serious bodily injury and that the jury charge authorized a non-unanimous verdict.

## THE FACTS

The indictment alleged, in relevant part, that on or about March 31, 2003, the appellant "intentionally or knowingly cause[d] serious bodily injury or serious mental deficiency, impairment, or injury to [M.V.], a child 14 years of age or younger, by act, to-wit: by confining or restraining [M.V.] in a bathroom or bedroom." During the jury-charge conference, the appellant's counsel persuaded the trial court to remove the theory of confinement or restraint in the bedroom from the charge. Accordingly, the application paragraph authorizing the jury to convict the appellant of the first degree felony offense of injury to a child read:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 31st day of March, 2003, in Denton County, Texas the defendant ... did then and there intentionally or knowingly cause serious bodily injury or serious mental deficiency, impairment, or injury to [M.V.], a child 14 years of age or younger, by act, to-wit: by confining or restraining [M.V.] in a bathroom, you will find the defendant guilty of Injury to a Child, as charged in the indictment.

Thus, the State's theory of the case was that the appellant caused M.V. either serious bodily injury or serious mental deficiency, impairment, or injury by confining or restraining him on a particular occasion in a bathroom.

The evidence at trial relevant to this allegation showed that the appellant was M.V.'s step-mother. When M.V. was three years old, in December of 2002, he was placed in his biological father's custody. His father lived with the appellant and their three young children in a single-wide trailer. The appellant delivered newspapers in the early morning hours, and would then sleep during the day. On one or more occasions, she locked M.V. in the bathroom of the trailer while she slept. The appellant's oldest child testified that the appellant restrained M.V. by duct-taping him to the toilet seat. The trauma of this confinement and/or restraint caused M.V. to suffer from constipation. By the time Child Protective Services removed M.V. from the trailer and placed him in foster care, in April of 2003, the constipation had become moderate to severe, and his abdomen was distended and hard.

The State presented evidence to show that M.V. suffered both physical and psychological damage from this abuse. With respect to serious bodily injury, the State offered the testimony of a pediatrician, Dr. Cindy Holt, who had treated M.V. in the hospital shortly after he was placed in foster care. She first testified as follows:

Q. At some point, did you send the child for some x-rays and tests?

A. The emergency room did that and those were available for my review on his admission.

Q. And did you review those as part of your examination of this child?

A. Yes.

Q. And tell the jury what, if anything, the x-rays revealed.

A. The x-rays revealed increased stool throughout the colon, indicating that the child was constipated. The symptoms that he presented with would have certainly supported that diagnosis, along with some minor obstruction of his urinary tract from the constipation given that he couldn't urinate.

Q. Was this a mild case of a child being constipated or severe?

A. Moderate to severe.

Q. What kind of concerns do you get when something like this happens?

A. Constipation in and of itself is fairly common during toilet-training, as children—they don't want to defecate on the toilet—tend to hold it, and it becomes hard and they try to defecate and it hurts, and then they really don't want to go and it becomes this vicious cycle. So in a child his age, in and of itself the constipation is not concerning in the absence of other findings. It's just a matter of intervention with appropriate toilet-training and evacuating the colon so that the act of defecation is no longer painful and then retraining them to basically go without pain.

* * *

Q. I have previously shown you the legal definition of "serious bodily injury." Is that right?

A. Yes.

Q. And if "serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, I guess you could comment on that part? In your medical opinion and based on your training and experience, after examination of this child, in your opinion did he have bodily injury that created a substantial risk of death?

A. Yes, he did.

Q. And tell the jury why you say that.

A. When I saw [M.V.], he was not at risk of death. The injuries that he happened to sustain were not an immediate risk of death. However, that probably was luck of the draw. When you sustain a large trauma to the abdomen, you risk not only injuring the liver, you risk in-juring a much more fragile organ called the spleen, and that's located on the other side of the abdomen from the liver. If you injure the cells of the spleen, you can bleed to death very quickly. And he didn't sustain an injury to his spleen that we could detect. However, again, he was lucky. That much abdominal trauma carries a substantial risk of serious injury to that organ and if that organ had have been injured, he could have died.

Q. So with the liver enzymes as well elevated, as high as they were, is that something that causes a concern as far as creating any kind of substantial risk of death of this child if untreated?

A. You mean the liver enzymes alone?

Q. The liver enzymes and the—I guess the total assessment of this child taken together.

A. Yes, especially if the injuries were to continue to happen. Acutely, I would have to say no, he did not, but ...

* * *

A. "Acute" means within the last one to two weeks at the outside. Potentially some injuries also within the last few days. * * * The severity of his constipation, if it had been long-standing, had progressed. In other words, when I saw him, he couldn't urinate. He couldn't go to the potty at all. That would not have been there for the last three months, five months, or a year because obviously he would have come to medical attention at that point. So when I put the whole picture together of recent trauma to the abdomen, again, the liver enzymes, trauma to the abdomen didn't happen any longer than a

week or two before I saw him.[3]

On cross-examination, the appellant's counsel also questioned Dr. Holt about serious bodily injury:

Q. So "acutely" in medical terms means like now, presently. That's one of the—

A. Yes.

Q. So when you talked about the abdomen and the risk of death, you said acutely, no. But it could have if the injury would have been different, if the spleen would have been hit, or if it would have gone on. Am I characterizing that right?

A. Yes.

Q. So the injury that is acute—and by that I mean the injury that is present, not "could be," "lucky miss," none of those qualifiers. The injury that is acute, the injury that exists, does not create a risk of death?

A. [M.V.] was not at risk of dying when I saw him.

Q. Doctor, do the injuries that are present have a risk of death? Without adding his spleen could have been damaged or if, in your opinion, abuse would have continued. Take those out of the equation. As you examined him, does the injury create a substantial risk of death? It doesn't, does it?

A. The injury that he presented with, no.

During later cross-examination, Dr. Holt herself once again broached the subject of whether the constipation caused serious bodily injury:

Q. Did we see any other evidence on either leg that was serious—serious bodily injury in any way, shape, or form, the legs? Like are any of those bruises on the legs serious bodily injury?

A. No. The constipation could have been if there was no intervention. I don't know if that matters.

Q. Well, eventually. But as it presented itself that day, I think we talked about it was moderate to severe and it was not a risk of death as it presented itself. Would that be fair?

A. Because there was intervention.

Q. My question is: As it presented itself, it did not have substantial risk of death?

A. Because there was intervention.

[Defense Counsel]: Objection, non-responsive.

THE COURT: I don't know if it is nor not. I mean, if you can answer the question yes or no, answer the question yes or no. If you can't, then you have your answer.

Q. (BY [Defense Counsel]) As it presented itself, did the child at that moment—did that injury create substantial risk of death? Not what could happen if it went on for a long time, but right then and there?

A. When you present with cancer, you're not at risk of death, but if you don't treat it, you're going to die.

---

**3.** Because of bruising on M.V.'s abdomen and the elevated liver enzymes, Dr. Holt was of the view that M.V. had suffered some kind of blow to the abdomen, and it is apparent that the "trauma" to the abdomen of which she speaks was at least partly attributable to such a blow, rather than strictly attributable to the constipation caused by the confinement and/or restraint in the bathroom. It was also, apparently, the abdominal blow that triggered Dr. Holt's concern about the risk of injury to M.V.'s spleen, but as her testimony demonstrates, she found no evidence of such a spleen injury. There is no evidence to show how M.V. might have sustained such a blow to the abdomen, and that is not the injury upon which the State elected to proceed in the jury charge.

[Defense Counsel]: Objection, nonresponsive.

THE COURT: That's nonresponsive. Sustained.

Q. (BY [Defense Counsel]): Doctor, can you please try to answer my question?

A. Yes. I'm not trying to be difficult, but I'm also trying to present the truth and be accurate.

Q. Did the injury as it presented itself at that time—

A. When [M.V.] came to me, he was not on the verge of death, if that's what you're asking me.

Q. That's not what I asked you. I asked you: Did the injury as it was acutely presented create a substantial risk of death?

\* \* \*

THE WITNESS: The way I understand the question you're asking me, when I saw [M.V.], was he at risk of dying at that moment? And the answer is no, he was not. That's the way I understand the question.

Q. (BY [Defense counsel]): In the time frame for it to progress to where it would be risk of death, how much longer of a time frame are you talking about?

A. With the injuries that he had, again, if you assume that they were not repeated, it would have to be a significant length of time.

Q. Okay. All right, then.

A. Weeks.

Q. Well, I'm really just talking about the abdomen at this point.

A. Yes. I agree. I'm thinking the same thing.

Q. At least—well, weeks, you said?

A. Days to weeks, yes.

Q. You're changing it now to days or weeks? There's a big difference between the two. You said weeks. Is it weeks?

A. Days to weeks.

Q. Okay. And so you're saying he could have died in two days?

A. If the constipation had progressed and he had ruptured anything in his intestines, yes.

Q. If anything of those things would have happened. Did you see any evidence that that was on the verge of happening?

A. On the verge of happening, meaning within the next 24 hours? No.

Q. Okay. Any evidence that it was going to happen in 48 hours?

A. I don't know that. He was obstructed with his urinary tract and I don't know. I can't say what would have happened.

Q. Okay. Once the bowels were evacuated, is there any evidence or would you—well, do we have any evidence that there was serious permanent disfigurement due to that. Did his stomach go back down?

A. You're speaking of the abdomen—

Q. Yes, ma'am.

A. And the intestines? No, there was no serious long-term ramifications that appeared to be evident.

The State declined to take Dr. Holt on redirect examination.

To establish serious mental deficiency, impairment, or injury, the State offered the testimony of a therapist, Dr. Michelle Young. M.V. told Dr. Young during his treatment that the appellant had taped him to the toilet seat. The trauma of this experience caused M.V. to suffer from

Post–Traumatic Stress Disorder.[4] The appellant does not now challenge that Dr. Young's testimony was sufficient to establish serious mental deficiency, impairment, or injury, and for purposes of this opinion we will assume that it was.[5]

## ON APPEAL

The court of appeals held that the trial court erred in failing to grant an instructed verdict on the part of the indictment that alleged serious bodily injury because the evidence was legally insufficient to establish that theory of the offense of injury to a child. As the court of appeals explained:

> Dr. Holt testified that, if the constipation had been left untreated and had progressed, it could have become serious bodily injury. But she acknowledged that there was no evidence of permanent disfigurement to M.V. as a result of his constipation and that there were "no serious long-term ramifications" to his stomach and intestines. She said that M.V. began to stool spontaneously after being given an enema.

> Although this evidence shows that M.V.'s constipation could have become a serious bodily injury absent medical intervention, it does not show that the injury, "as it was inflicted," constituted

serious bodily injury as that term is statutorily defined.[6]

Accordingly, the court of appeals "render[ed] a judgment of acquittal on the serious bodily injury offense[.]" [7]

The court of appeals did not order an outright acquittal, however, because the evidence did support a conviction for injury to a child on the theory that the appellant had caused M.V. to suffer serious mental deficiency, impairment, or injury. The two theories were submitted to the jury in the disjunctive in a single application paragraph. The appellant argued on appeal that the error in submitting the theory of serious bodily injury was harmful because "there is strong reason to believe that the jury did not unanimously agree on a proper legal standard when they convicted" her.[8] Therefore, the court of appeals proceeded to inquire whether the trial court erred to instruct the jury that it could convict the appellant of injury to a child without indicating unanimity on whether the appellant's conduct caused serious bodily injury on the one hand, or "serious mental deficiency, impairment, or injury" on the other. In its analysis of this question, the court of appeals seems to have assumed that the appellant objected to the jury charge, because it announced that it was looking for "some harm," rather than "egregious harm," as would be the

---

**4.** Other testimony showed that, whereas M.V. had been a happy child who had been toilet trained prior to going to live with the appellant, afterwards he reverted to wearing diapers, hoarded food, and was afraid to take baths. It was not shown that any of this behavior was caused specifically by the experience of having been confined in the bathroom or restrained on the toilet.

**5.** As the court of appeals noted, the appellant practically conceded the sufficiency of the evidence to prove mental injury on appeal. *See Stuhler v. State, supra,* at *4 (slip op. at 10 n. 17).

**6.** *Stuhler v. State, supra,* at *2 (slip op. at 6) (footnotes omitted). For the proposition that the seriousness of the injury must be assessed "as it was inflicted," rather than as "ameliorated or exacerbated by other actions such as medical treatment[,]" the court of appeals cited *Fancher v. State,* 659 S.W.2d 836, 838 (Tex.Crim.App.1983), and *Brown v. State,* 605 S.W.2d 572, 575 (Tex.Crim.App.1980).

**7.** *Id.* at *4 (slip op. at 11–12).

**8.** Brief for the Appellant, at 5.

case for unobjected-to jury-charge error.[9]

The court of appeals concluded that, under the plain language of the statute,[10] causing serious bodily injury should be regarded as an offense separate from causing serious mental injury and held that a jury charge that failed to require unanimity as between these two offenses violated the appellant's right to a unanimous jury verdict.[11] "This harm is exacerbated by the fact that there is no evidence to support one of these offenses."[12] The court of appeals therefore reversed the conviction and "remand[ed] the cause to the trial court for a new trial on the serious mental injury offense."[13]

## SERIOUS BODILY INJURY

■ The Penal Code defines serious bodily injury to be "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."[14] The jury charge instructed the jury accordingly. This Court has long held that in assessing the sufficiency of the evidence to establish serious bodily injury, the question is the degree of risk of death that the injury caused, or the disfiguring or impairing quality of the injury, "as it was inflicted, not after the effects had been ameliorated or exacerbated by other actions such as medical treatment."[15] The State now takes issue with the court of appeals' conclusion that M.V.'s constipation

did not constitute serious bodily injury "as it was inflicted." Because the constipation did not actually kill M.V., we will address in turn whether the evidence shows that the constipation, "as it was inflicted," 1) created a substantial risk of death; 2) caused serious permanent disfigurement; or 3) caused protracted loss or impairment of the function of any bodily member or organ.

### A. Substantial Risk of Death

■ The State asserts that the court of appeals erroneously assessed the risk of death from M.V.'s constipation after medical intervention, rather than assessing what the risk would have been had the constipation continued "unattended." We disagree. Dr. Holt plainly testified that as M.V. "presented" to her, he was not at risk of death. She further testified that, taking *continued* abuse out of the equation, she did not regard M.V.'s condition as life-threatening.

■ This does not necessarily mean, of course, that his constipation could not have *become* deadly, as Dr. Holt testified, had it been allowed to "progress." Although M.V. stooled spontaneously when given an enema in the hospital, the constipation could conceivably have progressed to a life-threatening stage absent that medical intervention. But it is unclear from Dr. Holt's testimony that she believed the constipation *would* have progressed absent

9. *Almanza v. State*, 686 S.W.2d 157, 171–2 (Tex.Crim.App.1985) (opinion on State's motion for rehearing) (construing Tex.Code Crim. Proc. art. *36.19*); *Abdnor v. State*, 871 S.W.2d 726, 731–2 (Tex.Crim.App.1994); *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App. 1986).

10. *See note 1, ante.*

11. *Stuhler v. State, supra*, at *4 (slip op. at 10–11).

12. *Id.* at *4 (slip op. at 11).

13. *Id.* at *4 (slip op. at 12).

14. Tex. Pen.Code § 1.07(46).

15. *Fancher v. State, supra, quoting Brown v. State, supra.* See also *Boney v. State*, 572 S.W.2d 529, 532 (Tex.Crim.App.1978).

medical intervention. The injury that the appellant inflicted upon M.V. occurred at no discrete moment in time, as would be the case with a blow, a knife wound, or a gun-shot. Rather, it was the result of the appellant's having confined M.V. in the bathroom, and perhaps having restrained him physically on the toilet. The injury did not happen in an instant, but over an undetermined period of time, apparently as a psychological reaction to the confinement and/or restraint.[16] The evidence does not speak to whether, once the confinement and restraint came to an end and the psychological trauma dissipated, the constipation would have "progressed" to a deadly level, even absent medical intervention. Dr. Holt's testimony, to the extent that it addressed this question at all, seems to have indicated that, removing continued abuse from the equation, she did not consider M.V.'s condition to be dangerous. We take this to be the court of appeals' meaning when it declared that the injury "as it was inflicted" was not shown to be life-threatening. In making the determination whether an injury caused a substantial risk of death, courts should look to the degree of injury that the assaultive behavior in fact caused, not the degree of injury that *might* have resulted had the assaultive behavior persisted. Because the State had the burden of production and persuasion on the issue of serious bodily injury, the court of appeals correctly held that this deficiency in the evidence precludes a rational jury finding that the constipation created a substantial risk of death.

### B. Serious Permanent Disfigurement

When expressly asked about serious permanent disfigurement to M.V.'s stomach or intestines, Dr. Holt replied that "there was no serious long-term ramifications that appeared to be evident." There is no contrary evidence in the record. The court of appeals correctly concluded that there was also insufficient evidence to show serious bodily injury by this statutory definition.

### C. Protracted Loss or Impairment of the Function of Any Bodily Member or Organ

Dr. Holt was never asked to express any opinion whether the constipation resulted in the protracted loss or impairment of function of M.V.'s stomach or intestines. As we have noted, however, she did opine that she foresaw no "serious long-term ramifications" to these organs from the level of constipation that M.V. had suffered by the time he was brought to the hospital. Constipation is, of course, by definition a dysfunction of the bowels. It is possible, perhaps even probable, that, had M.V.'s constipation progressed, it would have caused some "protracted" loss or impairment of function. But as we have observed, Dr. Holt did not testify that, once the confinement and restraint came to an end, the constipation would inevitably have progressed to this level. The evidence does not show one way or the other whether M.V. could have eventually stooled spontaneously at some point, even without medical intervention, once the psychological trauma of his confinement and restraint were allowed to subside. Again,

---

**16.** Indeed, although the indictment and jury charge required a finding of confinement and restraint in the bathroom "on or about the 31st day of March, 2003," the evidence suggested that this event occurred on an unspecified number of occasions around that date, but in any event more than once. However, by at least April 6, 2003, M.V. was no longer in the appellant's custody, so there could have been no further occasions of confinement and/or restraint after that date. A foster mother took M.V. to the hospital on April 9, 2003, and Dr. Holt examined him there on April 10, 2003.

this lack of clarification in the evidence must cut against the party with the burden of proof.

It is true, as the State emphasizes, that the constipation had reached a point that it was obstructing M.V.'s urinary tract. But Dr. Holt expressly described this dysfunction as "minor." Once again, while it is conceivable that the urinary obstruction, if left untreated, might have progressed or endured to the point that it would support a jury finding of a protracted loss or impairment of urinary function, there was no testimony to this effect, and the conclusion that it would have so progressed is not self-evident.

We do not think that the court of appeals misapplied our earlier case law. We agree with its conclusion that the evidence did not support a jury finding of serious bodily injury beyond a reasonable doubt.

### JURY UNANIMITY

For the first time in its brief on the merits, filed after we granted the petition for discretionary review, the State asserts that the court of appeals erred to evaluate the disjunctive application paragraph for some harm instead of egregious harm. Our review of the record reveals that the appellant failed to specifically object that the application paragraph that was ultimately submitted authorized the jury to convict her upon a finding *either* that she caused M.V. serious bodily injury *or* serious mental deficiency, impairment, or injury, thus allowing a guilty verdict without requiring all twelve jurors to agree upon the type of injury that was inflicted.

Of course, the objection that the appellant *did* make to the application paragraph, had it been sustained, would have

mooted any objection on the basis of jury unanimity. The trial court would then have removed the serious bodily injury element from the application paragraph, thus requiring all of the jurors to find serious mental injury as a prerequisite to conviction. Still it is accurate to say, as the State belatedly contends, that the appellant failed to make a specific jury-unanimity objection at the trial court level. We need not decide whether the State's argument with respect to the proper harm analysis comes too late. We agree with the court of appeals that the application paragraph did violate the appellant's right to a unanimous jury verdict and hold that this defect would require reversal of the conviction even under an egregious-harm standard of review.

### A. Error in the Application Paragraph

Article V, Section 13 of the Texas Constitution requires a unanimous jury verdict in all felony cases.[17] The court of appeals held that jury unanimity was required with respect to the type of injury caused in this case on authority of this Court's opinions in *Francis v. State*[18] and *Ngo v. State*.[19] But neither of these two cases is dispositive of the issue presented here.

Both *Francis* and *Ngo* involved separate and discrete incidents of commission of a single statutorily defined offense, but by different acts. In *Francis,* in a prosecution for indecency with a child, the jury was not required to agree as between two different theories of indecency (touching the breast versus touching the genitals) that occurred on different dates. In *Ngo,* a prosecution for credit card abuse, the jury was not required to agree among three theories of the offense (stealing a credit card versus receiving a stolen credit

---

**17.** Tex. Const. art. V, § 13.

**18.** 36 S.W.3d 121 (Tex.Crim.App.2000).

**19.** 175 S.W.3d 738 (Tex.Crim.App.2005).

card versus presenting a credit card with intent to obtain a benefit fraudulently) that the evidence showed occurred on three separate and discrete occasions. The rationale of these two cases seems to turn not so much on the fact that different theories of the offense were involved, but on the fact that each of the separate and distinct theories of commission of the offense occurred at a separate and discrete point in time from the others. We held that jury unanimity required that the jury agree upon a single and discrete incident that would constitute commission of the offense alleged.[20]

In the instant case, it is not clear whether the State was relying upon a single act of confining and/or restraining M.V., or upon a series of such confining and/or restraining incidents.[21] The evidence suggested more than one such incident, but did not pinpoint any particular one. Under these circumstances, if it was the series of incidents that ultimately served to cause the constipation and consequent injuries to M.V., rather than a discrete incident, the State would not be required to elect among them, and the jury need not necessarily have agreed upon a particular incident of confinement and/or restraint to justify a conviction.[22] In *Crocker v. State*,[23] the appellant caused injury to his victim by exposing him to a radioactive

substance on a number of occasions over a period of time.[24] Rejecting the appellant's argument that the State should have been required to elect among the various discrete incidents of exposure, we held:

> If it has ever been the rule in this state that when one sets out to maim or murder another gradually through a series of acts the prosecution is required to elect and rely upon only one of the acts to obtain a conviction, it is no longer the rule. We hold that the court did not err in refusing to require the State to elect among the transactions involving radiation exposure.[25]

On facts such as these, the series of acts constitutes the commission of the offense. It follows that the jury charge should not require the jury to agree as to any particular act in the series before it can convict. Inasmuch as they hold that jury unanimity requires jury agreement as to a separate and discrete incident to convict, *Francis* and *Ngo* are inapposite here.[26]

■ Nevertheless, we agree with the court of appeals' conclusion that the jury should have been required to agree unanimously that the appellant caused either serious bodily injury or serious mental deficiency, impairment, or injury. Since the court of appeals issued its opinion in this

---

20. *See* George E. Dix & Robert O. Dawson, 42 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 30.52, at 670 (2d ed. 2001) ("*Francis* involved different offenses rather than different theories of one offense, apparently because 'different incidents' were presented in *Francis*.").

21. *See* note 16, *ante*.

22. *See* Dix & Dawson, *supra*, § 30.57 (State not required to elect when "the evidence can be analyzed as showing different and distinguishable incidents, but the proof of these incidents would not permit a jury to find that

the individual incidents each constituted the charged offense.").

23. 573 S.W.2d 190 (Tex.Crim.App.1978).

24. *Id.* at 194–7.

25. *Id.* at 199.

26. *See Jefferson v. State*, 189 S.W.3d 305, 313 n. 11 (Tex.Crim.App.2006) (noting in *dicta* that child-abuse crimes may be regarded as continuous offenses, which do "not require jury unanimity on any specific, discrete act....").

cause, we have decided *Jefferson v. State*.[27] Like the instant case, *Jefferson* involved a prosecution for injury to a child. We were called upon to decide whether the jury charge should have required the jury to make a unanimous finding whether the appellant caused the injury by his action or by his omission, either of which is an acceptable theory under Section 22.04 of the Penal Code. We held that the jury need not agree unanimously that Jefferson caused injury by act or by omission.[28]

Our reasoning in arriving at this conclusion is instructive. Whether the jury must unanimously find that injury to a child was accomplished by act or omission was, we held, primarily a question of legislative intent.[29] We observed that prior case law has regarded the gravamen of the offense of injury to a child to be, not the particular conduct that caused the injury, but the resulting injury that the conduct caused. In other words, injury to a child is a "result of conduct" offense, which does not specify the "nature of conduct" by which the result is caused.[30] Whether Jefferson caused the injury alleged in that case by an act or an omission was not elemental, we concluded, since the statute does not make the "nature of conduct" of any consequence. Thus the Legislature could not have intended for the state law requirement of jury unanimity to apply, and the jury verdict need not reflect a unanimous determination whether the offense was committed by act or omission.

In a concurring opinion that joined the majority, Judge Cochran suggested a general rule of thumb for making this determination of legislative intent:

> In sum, we must return to eighth-grade grammar to determine what elements the jury must unanimously find beyond a reasonable doubt. At a minimum, these are: the subject (the defendant); the main verb; and the direct object if the main verb requires a direct object (i.e., the offense is a result-oriented crime).... Generally, adverbial phrases, introduced by the preposition "by," describe the manner and means of committing the offense. They are not the gravamen of the offense, nor elements on which the jury must be unanimous.[31]

Applying this rule of thumb in the instant case, we conclude that the jury charge should have required a unanimous verdict whether the appellant caused serious mental deficiency, impairment, or injury.

In Section 22.04(a) of the Penal Code, the main verb defining the offense of injury to a child is, of course, "causes." The direct object of that main verb is, variously, "serious bodily injury," "serious mental deficiency, impairment, or injury," or plain "bodily injury."[32] The Legislature has thus defined the offense of injury to a child according to the kind and degree of injury that results. As the court of appeals not-

---

27. *Id.*

28. *Id.* at 306.

29. *Id.* at 312 (noting that, like the United States Supreme Court, we decide what level of specificity is required in a jury verdict to satisfy the requirement of jury unanimity as a function, at least in the first instance, of statutory construction, citing *Richardson v. United States*, 526 U.S. 813, 817–8, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999)).

30. *Ibid.* For this proposition, we cited *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex.Crim. App.1985), and *Beggs v. State*, 597 S.W.2d 375, 377 (Tex.Crim.App.1980).

31. *Id.* at 315–6 (Cochran, J., concurring, joined by Price and Johnson, J.J.)

32. TEX. PEN.CODE § 22.04(a)(1), (2) and (3), respectively.

ed,[33] these various results are set out in different subsections of the statute, and the degree of the offense is determined, at least in part, according to which of the results the defendant's act or omission caused.[34] We think that the court of appeals correctly concluded that the Legislature intended the separate results spelled out in the various subsections of the statute to be elemental and thus required jury unanimity.[35]

## B. Egregious Harm

 Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory.[36] In examining the record to determine whether jury-charge error is egregious, the reviewing court should consider the entirety of the jury charge itself, the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole.[37] We conclude that the jury-charge error in this case deprived the appellant of her valuable right to a unanimous jury verdict.

Although the evidence was sufficient to establish serious mental injury, by far the greater bulk of the State's evidence in this case was devoted to trying to establish serious bodily injury. For example, Dr. Holt's testimony with respect to serious bodily injury runs more than twice as long in the reporter's record as Dr. Young's testimony regarding serious mental injury. Moreover, Dr. Holt's testimony was not limited to bodily injury that resulted from M.V.'s constipation. Much of her testimony related to other injuries M.V. sustained in the appellant's care, including burns on his hand, a blackened tooth, bruises on various parts of his body, and healing fractures of the leg and arm.[38] Given this emphasis in the State's presentation of the case, the risk of a non-unanimous verdict was substantial.

Unlike Ngo, in which we also found egregious harm from the failure of the jury charge to require jury unanimity,[39] here the State's final argument did not make a point of stressing to the jury that it need not agree which of the elemental facts occurred. But the State did argue to the jury that the evidence would support a verdict based on either serious bodily injury or serious mental injury. Since the jury charge itself did not require the jury to agree on one result or the other, the jury could readily have convicted the appellant without even substantively debating which of the two types of injury she caused. In no other part of the jury

33. Stuhler v. State, supra, at *4 (slip op. at 10).

34. Tex. Pen.Code § 22.04(e), (f), and (g).

35. Because we hold that the Legislature contemplated jury unanimity with respect to the particular statutory results the defendant caused, we need not proceed to the second step of the analysis, which asks whether dispensing with the jury-unanimity requirement would violate due process. See Jefferson v. State, supra, at 312, 313.

36. Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim.App.1996) (plurality opinion). See also,

Almanza v. State, supra, at 172; Ngo v. State, supra, at 750.

37. Bailey v. State, 867 S.W.2d 42, 43 (Tex. Crim.App.1993); Almanza v. State, supra, at 171; Ngo v. State, supra, at 750 n. 48.

38. The indictment alleged that the appellant caused serious bodily and mental injury by holding M.V.'s hand under hot water and twisting or pulling his arm and leg. Ultimately, none of these theories of the case was submitted to the jury.

39. 175 S.W.3d at 750–2.

charge or the arguments of counsel was the jury ever informed that it must unanimously agree on one result or the other, or both.

The major point of contention between the parties during final argument was whether the appellant harbored the requisite culpable mental state to justify convicting her of the first degree felony, rather than one of the lesser degrees of injury to a child. The State urged the jury to find that it had been the appellant's conscious objective to inflict M.V.'s serious injuries, whether bodily or mental—or at least she could have been substantially certain her conduct would have caused such injury. The intentional infliction of serious injury to a child is a first degree felony,[40] but the jury charge authorized conviction for the lesser-included offenses of reckless serious (either bodily and mental) injury to a child, a second-degree felony,[41] and criminally negligent serious (either bodily and mental) injury to a child, a state-jail felony.[42] Appellant's trial counsel urged the jury to reject the inference that the appellant confined and/or restrained M.V. in the bathroom with a conscious objective or substantial certainty that doing so would cause either serious bodily injury or serious mental injury.[43] In refuting this defensive argument, the State relied at least as heavily upon the bodily injury that resulted (including the various injuries the jury was not ultimately authorized to convict the appellant for) as the mental injury. We think that this focus of the jury argument could only have increased the already substantial risk that the jury would not find it necessary to agree as to which type of injury the appellant inflicted. In our view, the failure to instruct the jury that it must unanimously determine that the appellant caused at least one of the two types of injury deprived her of a fair and impartial trial.[44]

## CONCLUSION

The judgment of the court of appeals is affirmed.

KELLER, P.J., filed a dissenting opinion in which WOMACK, KEASLER, and HERVEY, JJ., joined.

KELLER, P.J., dissenting in which WOMACK, KEASLER, and HERVEY, JJ., joined.

I disagree with the Court's conclusion that the evidence was insufficient to show "serious bodily injury." Serious bodily injury includes, among other things, "any impairment of a physical condition [1] ... that creates a substantial risk of death." [2] Appellant restrained the three-year-old

---

40. TEX. PEN.CODE § 22.04(e).

41. Id.

42. Id. § 22.04(g).

43. Indeed, during the charge conference at the guilt phase of trial, the appellant's counsel had argued that the jury should not even be authorized to find her guilty of the first-degree felony offense because the evidence did not establish that the appellant had caused the serious bodily or mental injury intentionally or knowingly.

44. As the court of appeals observed, the harm is exacerbated by the fact that there was no evidence to support serious bodily injury.

Stuhler v. State, supra, at *4 (slip op. at 11). Given the emphasis in the State's evidence and in its final argument, at least some of the jurors might have convicted the appellant under the belief that she intentionally or knowingly caused an injury that the evidence does not support.

1. TEX. PEN.CODE § 1.07(a)(8)(definition of "bodily injury")

2. TEX. PEN.CODE § 1.07(a)(46)(definition of "serious bodily injury," which incorporates "bodily injury").

victim by duct-taping him to a toilet seat. As a result of this restraint, the victim suffered from "moderate to severe" constipation, causing his abdomen to become distended and hard. The pediatrician who treated the victim at the hospital testified that he suffered "serious bodily injury" from an injury that created a substantial risk of death. She further testified that the child was just lucky that his liver and spleen had remained undamaged. Had the spleen been injured, the child could have died very quickly. This evidence alone was sufficient to support a jury finding that appellant inflicted serious bodily injury.

In holding to the contrary, the Court cites the pediatrician's admission that, at the time she treated the child, the child was not in danger of dying. But that does not mean the child had suffered no risk of death in the meantime. At the time the child's intestinal system was impaired, there existed a substantial risk that the spleen or the liver could become damaged, which could in turn cause death. As it turned out, the child was fortunate: the constipation had not yet produced the injuries that could have occurred, and his body happened to be in good enough shape that it could probably have avoided those injuries for another twenty-four to forty-eight hours. But the child's good fortune simply means that the substantial risk of death was not realized. Moreover, the doctor emphasized that her assessment was based on the fact that "there was intervention." In the context of impairment, we have held that "[t]he relevant issue was the disfiguring and impairing quality of the bodily injury as it was inflicted, not after the effects had been ameliorated or exacerbated by other actions such as medical treatment."[3] The pediatrician testified that if the child's condition were left untreated, he could have died in two days. The child was *removed* from danger because he was *treated,* and his bowels were evacuated, relieving the constipation.

I also disagree with the Court's conclusion that appellant was harmed by the alleged violation of jury unanimity. Aside from the fact that evidence *was* sufficient to show "serious bodily injury," I believe appellant was not harmed because the evidence of "serious mental ... injury"[4] was virtually conclusive. There was evidence that it was the trauma from being taped to the toilet for long periods of time that caused the child's constipation in the first place. And common sense suggests that any three-year-old child undergoing the experience that occurred here would be additionally traumatized by having to remain on the toilet while suffering from constipation. A therapist testified that the trauma of the experience caused the victim to suffer from Post–Traumatic Stress Disorder. Although the child had previously been happy and toilet trained, after the incident he had nightmares, developed a problem with stuttering, suffered periods of uncontrolled defecation, reverted to wearing diapers, hoarded food, and was afraid of bathrooms. Given the overwhelming nature of the mental injury evidence, including the traumatic nature of the crime itself and the vulnerable age of the victim, I conclude beyond a reasonable doubt that any juror who found appellant guilty would find, at the very least, that "serious mental injury" was inflicted.

I respectfully dissent.

---

**3.** *Brown v. State,* 605 S.W.2d 572, 575 (Tex. Crim.App.1980) (broken nose that was reset).

**4.** Tex. Pen.Code § 22.04(a)(2). The term is not defined in the Penal Code.