**AFFIRMED and Opinion Filed August 13, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-22-00827-CR

**ERIC CHRISTOPHER JONES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-84601-2021**

## MEMORANDUM OPINION

Before Justices Carlyle, Goldstein, and Breedlove
Opinion by Justice Goldstein

Eric Christopher Jones appeals his aggravated sexual assault of a child and indecency with a child convictions. The jury convicted appellant and sentenced him to eight years' confinement on the sexual assault conviction and five years' confinement on the indecency conviction. In two issues, appellant argues the trial court erred in (1) refusing an evidentiary hearing on his motion for new trial alleging ineffective assistance of counsel and (2) not including a unanimity instruction in the jury charge. We affirm the trial court's judgment.

In October 2021, appellant was charged by indictment with four counts of sexual assault of a child and three counts of indecency with a child[1]. Appellant pleaded not guilty and proceeded to a jury trial. At trial in July 2022, the complainant, A.C., testified she was sixteen years old and her birthday was in March 2006. A.C. testified that, on June 25, 2020, she was at her aunt Jeannie's apartment where she went swimming with Jeannie and Jeannie's two sons, four-year-old L.J. and two-year-old J.J. Appellant was married to Jeannie, but he was at work that day. Around 4:30 p.m., A.C., Jeannie, and the boys went back to the apartment, and appellant came home from work. At approximately 5:00 p.m., Jeannie left, purchased liquor for appellant, and dropped it off at the apartment. Jeannie then went to work, where she typically worked from 6:00 to midnight.

After Jeannie left for work, appellant offered A.C. a drink of tequila, and A.C. and appellant had "a few shots of tequila in the kitchen." A.C. and appellant went out to the couch and watched a movie, but A.C. got up and went out onto the balcony where she watched videos on her phone. Appellant came outside with more shots of tequila, and A.C. "took them." A.C. felt "dizzy, drunk." Appellant told A.C. to come inside, and she came inside and lay on the couch where L.J. and J.J. were still watching a movie.

---

[1] Prior to commencement of trial, the State abandoned Count II, Count IV and Count VII in the indictment but requested to present those allegations under Rule 404(b) as contextual evidence in the same transaction under Rule 404(b)(2). The defense objected and the court granted the State's request.

–2–

Appellant was "gone for a little bit," and when he came back "he had his gun with him." Appellant set the gun on the coffee table and sat "right next to [A.C.'s] legs." Appellant told A.C. that if she did not do what he wanted, he would kill himself. Appellant was "getting angry," and he pulled down A.C.'s shorts and underwear. A.C. said "No, get off me" and told appellant she was on her menstrual cycle. Following appellant's demand, A.C. pulled out her tampon and set it on the floor. Appellant put his head between A.C.'s legs and held her down by her hips on the couch. A.C. felt appellant's tongue between her legs on the "inside" of her vagina, and it felt "wet and slippery." After appellant was "done," he took off A.C.'s shirt and bra and "starts putting his mouth on [A.C.'s] breast" in what felt like a "sucking motion" that "kind of hurt." Appellant spread A.C.'s legs with his hands, and his "whole body was in between [A.C.'s] spread legs." Appellant inserted his penis in A.C.'s vagina, and A.C. felt "a lot of pressure and it hurt." During the assault, appellant told A.C. "Shut up . . . and deal with it." Appellant also squeezed A.C.'s breast with his hand. A.C. "tried kicking [appellant] off [her], but "[t]hat didn't really work," and appellant "just kept telling [A.C.] to shut up."

In response to questioning, A.C. confirmed that "some parts of the night" were "a little bit fuzzier," but she remembered appellant putting his penis in her mouth and "grunting." A.C. also remembered appellant putting his "fingers up in [A.C.'s] vagina," and "[t]hat one hurt."

–3–

Appellant stopped assaulting A.C. "around the time Jeannie was supposed to be coming home." A.C. told appellant she was going to be sick, "got up real fast" and "grabbed [her] clothes," went to the bathroom and threw up. A.C. "remember[ed] locking the bathroom door . . . [a]nd then somehow he's in the bathroom, like, after [A.C.] threw up." Appellant told A.C. she "needed to go on the bed, but [she] was on the floor. Helping A.C. walk, appellant took A.C. to the guest bedroom where she lay down "for a few minutes," and then appellant told A.C. she "needed to go into the master bedroom." A.C. remembered going into the master bedroom and lying down "on the bed under the covers" where appellant pulled up A.C.'s shirt and bra again and put his mouth on her breast again. A.C. recalled at that point, Jeannie came home, said A.C. had "a worried look on [her] face," and told A.C. to go back in the guest bedroom. In the guest bedroom with Jeannie, A.C. told Jeannie what happened, and Jeannie "was mad." Jeannie confronted appellant and tried "to kick him out of the room," but appellant denied doing anything. Appellant, Jeannie, and A.C. "end[ed] up back in the master bedroom," appellant pushed Jeannie on the bed, and A.C. called 911. A.C. remembered the police arriving, being taken to the hospital, and having to do an exam that night. During A.C.'s testimony, the State introduced a photograph of the crime scene showing a tampon on the floor next to the couch in the apartment.

Kasey Duke, a registered nurse and certified sexual assault nurse examiner, testified she performed a sexual assault exam on A.C. at Children's Medical Center

in Plano following the assault. During the exam process, Duke swabbed "where [A.C] said things that occurred, where she was touched, kissed" and in A.C.'s anal/genital area.

Brent Hester, a forensic scientist with the Texas Department of Public Safety, testified he received a DNA sample from appellant and tested it against the swabs contained in A.C.'s sex assault kit. The swabs from A.C.'s anus, vulva, and breast contained a mixture of DNA from A.C. and appellant.

Appellant testified that, on June 25, 2020, he began drinking straight tequila around 6:30 p.m. A.C. asked if she could "try a sip," and appellant told her she was not going to like it and let her try it. A.C. "[m]ade a face," and appellant laughed and said, "I told you." After the one sip, appellant did not give A.C. any more alcohol. For a while, A.C. was "sitting at the end of the patio with her phone," and the boys were sitting in a chair. Appellant left the patio door open "so they could come and go as they wanted to." Around 8:30 p.m., "everybody settle[d] into the house." Appellant was "still doing [his] regular stuff," going to his room, "on [his] phone," and playing with the boys. When appellant "came out," A.C. said, "I'm drunk, but I know what my words are," and appellant "realized she had been drinking out of [his] bottle."

Appellant testified he "[n]ever" made a romantic or sexual advance on A.C. Appellant was "concerned" about A.C. because A.C. had made some "statements" of "sexual assaultive offenses" that were "within her family." Appellant "didn't

–5–

want to go into too much detail, but [he] asked her, Are you sure." Appellant decided to tell Jeannie when she got home, and he told A.C. about this decision. A.C. "freaked out and said no," and appellant "tried to calm her down." A.C. went into the bathroom. Appellant and L.J. "went to use the bathroom in our bathroom." When appellant came out, he could "hear A.C. heaving," and he saw "the bathroom door was cracked open." L.J. was with appellant, and they pushed the door open, asked A.C. if she was okay, and "saw her around the toilet." "Other than her throwing up in the toilet, [appellant] didn't see a big mess."

When Jeannie came home, appellant and the boys were in bed. Appellant "hit something as [he] rolled over, and [he] opened his eyes" to see A.C. "sitting on the side of the bed watching whatever movie, as she's done before." Jeannie was upset because appellant was drinking, and she "started yelling about the bottle of tequila that she found on the counter." Jeannie and appellant "started fighting about that." Jeannie and appellant had "been arguing a lot about alcohol," and it was something that, "at times," affected appellant's relationship with Jeannie. Appellant intended to leave, but he had to be at work the next morning at 8:00, so he gathered his tools, his work clothes, and his gun that he carried when he was working. Appellant testified he did not threaten to kill himself, threaten police, or wave his gun around.

After appellant packed up his equipment, Jeannie "kept getting in [appellant's] face so [he] couldn't walk out of the room." Appellant was "[n]ot really" in full control of his balance, and he "bump[ed] into" Jeannie. Appellant

testified he did not push Jeannie down. "Once she called the police, [appellant] wasn't going to leave then," so he "just said, Okay, I'll just wait for the police." When the police arrived, appellant "answered the door" and "invited them in." Appellant thought Jeannie had called the police "because we were arguing," and he thought it was "a disturbance or domestic violence." The police took appellant outside and questioned him "about the allegations that came to light by" A.C. "[t]owards the very end." Appellant "den[ied] it," and he disclosed his "concerns" about other family members to police. Nevertheless, police arrested appellant.

While appellant was in jail, Jeannie filed a protective order against appellant. Appellant was released from jail on bond, but he did not see Jeannie or the boys for four months "on purpose just because of [his] bond conditions." However, Jeannie "filed in October to have it removed." At that time, appellant and Jeannie were meeting in person, going on dates, having sexual relations, and talking about the case involving A.C. "[T]hings in conversations with Jeannie" indicated "family" was "skeptical about the allegations" made against appellant, but it also seemed "obvious" that "family was also putting a lot of pressure on Jeannie." Appellant felt that Jeannie's "family pressured her into not seeing" appellant, and she stopped seeing appellant face to face "the Thursday before November 19th."

On cross-examination, appellant testified he understood his DNA was found on A.C.'s breast, vulva, and anus. Appellant testified A.C. "used [appellant's] towel to wipe her entire body down when she through [sic] up," and the "only thing

–7–

[appellant could] assume" was that his DNA "ended up on her breast and in her vulva" because A.C. "used a towel." According to appellant, L.J. brought appellant's towel to give to A.C. when she was throwing up and "kind of sitting on the floor and her pants were down, which led appellant to assume "she was going to the bathroom and had to throw up." Appellant testified he was "not made aware of" the tampon next to the couch until "about a week after [his] arrest," and he had "no idea" how it got there.

At the conclusion of the evidence, the jury was charged with finding appellant guilty or not guilty of the following offenses: Count 1, sexual assault of a child by causing A.C.'s sexual organ to contact appellant's sexual organ; Count 3, sexual assault of a child by causing A.C.'s sexual organ to contact appellant's mouth; Count 5, indecency with a child by sexual contact, by touching A.C.'s breast with appellant's mouth; and Count 6, indecency with a child by sexual contact, by touching A.C.'s breast with appellant's hand. The jury found appellant not guilty of Count 1 and Count 5 and found appellant guilty of Count 3 and Count 6. Following his conviction and sentencing, appellant filed a motion for new trial on August 28, 2022, as part of which included a request for an evidentiary hearing. The record reflects efiled correspondence advising the trial court of the filing, the request for an

evidentiary hearing, and request to be notified of available dates. The motion for new trial was overruled by operation of law[2]. This appeal followed.

## ANALYSIS

### 1. Issue 1: Motion for New Trial: Ineffective Assistance

In his first issue, appellant contends:

> the trial court erred in refusing an evidentiary hearing on Appellant's motion for new trial. Appellant could not raise a claim of ineffective assistance of counsel without this evidentiary hearing. Appellant drafted, filed, and presented the motion for new trial. Yet the trial court did not hold an evidentiary hearing. Did the trial court err?

Ineffective assistance of counsel may be raised in a motion for new trial. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009). The record on direct appeal is generally insufficient to show that counsel's performance was deficient. *Prine v State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). Therefore, to the extent appellant's claim may not be determinable from the record, "we must decide whether his motion and affidavit show reasonable grounds that could entitle him to relief." *Smith v State*, 286 S.W.3d at 341. "To do so, the appellant must allege facts that would reasonably show that his counsel's representation fell below the standard of professional norms and that there is a reasonable probability that, but for his counsel's conduct, the result of the proceeding would have been different." *Id*. Appellant must demonstrate reasonable grounds for relief when alleging ineffective

---

[2] We address the particulars of appellant's motion for new trial in our discussion of appellant's first issue.

assistance of counsel to satisfy both *Strickland* prongs. *Id.* at 339 (discussing two prongs under *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The purpose of a hearing on a motion for new trial is to: (1) "decid[e] whether the cause shall be retried" and (2) "prepare a record for presenting issues on appeal in the event the motion is denied." *Smith*, 286 S.W.3d at 338. (citations omitted). Appellate courts review a trial court's denial of a request for a hearing on a motion for new trial under an abuse-of-discretion standard. *Id.* at 339. Under that standard, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.* A trial court abuses its discretion in failing to hold a hearing on a motion for new trial if the motion (1) raises matters that are not determinable from the record and (2) establishes reasonable grounds showing that the defendant could potentially be entitled to relief. *Id.* at 338–39.

Further, when, as here, a motion for new trial relies on a claim of ineffective assistance of counsel, the defendant must allege sufficient facts from which a trial court could reasonably conclude both that counsel failed to act as a reasonably competent attorney and that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different. *Id.* at 341; *Strickland*, 466 U.S. at 687.

"[R]ecogniz[ing] that an unrestricted requirement of a hearing on matters not determinable from the record could lead to 'fishing expeditions,'" the Court of

Criminal Appeals has also held that even a defendant who has raised such matters is not entitled to a hearing on his motion for new trial unless he "establishes the existence of 'reasonable grounds' showing that the defendant 'could be entitled to relief.'" *Smith*, 286 S.W.3d at 339 (quoting *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993)). The court in *Smith* continued: thus, we require, as a prerequisite to a hearing when the grounds in the motion are based on matters not already in the record, that the motion be supported by an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim. *Id.* The affidavit need not establish a prima facie case, or even "'reflect every component legally required to establish' relief." *Id.* (quoting *Reyes*, 849 S.W.2d at 816). It is sufficient if a fair reading of it gives rise to reasonable grounds in support of the claim. *Id.* But affidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, no hearing is required. *Id.*

Here, appellant's unsworn declaration in support of the motion for new trial stated the following:

> I met with Malcolm twice to prepare for my case. I think we should have met more. I was on bond and always available to him. He just did not have the interest in meeting with me and preparing for trial. There was a lot more that we could have done to prepare for trial and to hopefully secure a better outcome. Winning on half of the charges is a win for Malcolm, but I face a prison sentence and eventual lifetime registration as a sex offender.
> First I think there was a lot that could be done about the DNA evidence. I found [A.C.] on the floor of the bathroom throwing up. I

–11–

gave her a towel that I had used several times before (without yet washing) to use. Although I explained this to Malcolm, he did not raise it during trial.

Second, my wife testified against me by saying that [A.C.] "had a look" when my wife came home. My wife has felonies, and these could have been used against her for impeachment, but they were not. More importantly, I know my wife is living with her mother and that my wife's family has placed tremendous pressure on my wife to side with [A.C.]. I know that my wife is scared to go against her family for fear that they will cut her off financially. Also there have been threats from my wife's family that if my wife did not side with [A.C.] that the state would take my wife's children.

Third, I know that [A.C.] has made claims that her maternal grandfather has sexually assaulted her.

Fourth, I don't think that Malcolm was prepared to ask me questions during my testimony. He told me I was going to testify approximately five minutes before I testified, and the only thing he said to me was "don't come off as a creep." There was no discussion of what I would be asked or how I should answer. For this reason I did not get to give my version of events. I did not get to say that [A.C.] had confided in me about her maternal grandfather sexually abusing her. I did not get to testify about the pressure my wife was under to testify for [A.C.]. I did not get to explain the towel that I gave to [A.C.] and the potential DNA transfer. We had a case to put on and Malcolm simply did not do that.

The motion for new trial repeated his complaints about trial counsel. In the motion, appellant complained that his trial counsel did not address these issues, did not prepare appellant to testify, told appellant "that he would be testifying about five minutes before he started to testify," "did not prepare for this testimony and . . . did not discuss topics for direct or cross examination," and did not call any experts despite there being "questions about the meaning of the DNA that could only be answered by experts." The motion for new trial asserted further that trial counsel

–12–

was "aware" that appellant "had an explanation for why [A.C.] would invent these allegations," yet counsel did not ask appellant for this "explanation" during his direct examination. The motion did not specify the nature of appellant's "explanation." Appellant reiterated that trial counsel was deficient in failing to (1) meet with his client to prepare for trial; (2) prepare his client to testify; and (3) call an expert to testify concerning DNA, specifically as to "how the skin cell DNA might have been transferred or transmitted from" appellant to A.C.

The record shows appellant testified regarding his theory that a towel A.C. used to "wipe her entire body down" was the means by which appellant's DNA was transferred to A.C.'s breast, vulva, and anus. Appellant also testified about A.C.'s alleged outcry concerning a "family member" and Jeannie's being "pressured" by her family. To the extent appellant's motion for new trial claimed Jeannie "has felonies," neither the motion nor appellant's declaration make clear what these felonies involved or on what basis trial counsel could have admitted evidence showing Jeannie's prior felony convictions. Appellant's assertion that trial counsel met with him twice may be true, but appellant provided no specificity of duration, nature, or scope of those meetings. The amount of time spent on a case alone in not indicative of whether counsel conducted an adequate investigation. *Moore v. State*, No. 05-94-00873-CR, 1995 WL 73121, at *2 (Tex. App.—Dallas Feb. 21, 1995, pet. ref'd) (citing *Saunders v. State*, 715 S.W.2d 771, 774 (Tex. App.—Tyler 1986, no pet.)). Appellant's claim that he was told he would be testifying only five minutes

before he was called as a witness is contrary to the record. The record shows that, outside the presence of the jury, after the trial court confirmed appellant's wish to testify[3], the trial was then recessed from 10:19 a.m. to 10:40 a.m. Before the recess, the trial court admonished appellant that it was his decision alone whether to testify and that he would be subject to cross-examination if he chose to testify. Nothing in the record suggests that appellant was pressured to testify or given only five minutes in which to decide whether to testify. Finally, we note that the jury convicted appellant of only two of the offenses submitted in the charge and sentenced him to eight years' confinement and five years' confinement respectively when the charge set out a punishment range of two to twenty years.

On this record, we conclude appellant's motion for new trial did not raise a matter not determinable from the record, establish reasonable grounds showing appellant could potentially be entitled to relief, or allege sufficient facts from which a trial court could reasonably conclude that, but for counsel's alleged incompetence, there is a reasonable likelihood the outcome of the trial would have been different. *See Smith*, 286 S.W.3d at 338–41. Accordingly, we conclude the trial court did not abuse its discretion by not holding a hearing on appellant's motion for new trial. *See id.* We overrule appellant's first issue.

**Issue 2: Jury Charge Instruction: Unanimity**

---

[3] Further, the trial court, after stating that it was appellant's decision, of course, after consulting with his attorney in the case, inquired whether appellant made a decision as to whether he would testify and appellant stated "I'll testify."

In his second issue, appellant complains the trial court erred in failing to include a unanimity instruction in the charge. Specifically, appellant asserts the following:

> The two charges the jury convicted Appellant on are not continuing offenses and instead each time a person commits a violation, it is a new offense. Here the jury heard allegations of multiple violations, but the trial court did not require the jury to decide which offense Appellant committed (if any). The fact the jury acquitted Appellant of two of four offenses illustrates that the jury had problems with the State's evidence. Did the trial court err in not issuing a unanimity instruction?

Texas law requires that a jury reach a unanimous verdict about the specific crime that the defendant committed. *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). This means that the jury must "agree upon a single and discrete incident that would constitute the commission of the offense alleged." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007)). Relevant here, non-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions. *Id.* at 772. Each of the multiple incidents individually establishes a different offense or unit of prosecution. *Id.* The court's charge, to ensure unanimity, would need to instruct the jury that its verdict must be unanimous as to a single offense or unit of prosecution among those presented. *Id.*

Here, appellant was convicted of sexual assault of a child by causing A.C.'s sexual organ to contact appellant's mouth and indecency with a child by sexual contact, by touching A.C.'s breast with appellant's hand. The State only presented

–15–

evidence of one instance of appellant touching A.C.'s sexual organ with his mouth and one instance of squeezing A.C.'s breast with his hand while assaulting her on the couch.[4] Thus, there was no risk that non-unanimity might occur as to either offense. *See id.* We overrule appellant's second issue.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
220827F.U05

---

[4] Appellant claims he "touched" A.C.'s breast multiple times. However, A.C. testified to only one instance where appellant squeezed A.C.'s breast with his hands while he was assaulting her on the couch, as the jury found in convicting appellant of Count 6. The multiple instances of appellant touching A.C.'s breast with his mouth were the subject of a separate charge, Count 5, for which the jury found appellant not guilty.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ERIC CHRISTOPHER JONES,
Appellant

No. 05-22-00827-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the 401st Judicial
District Court, Collin County, Texas
Trial Court Cause No. 401-84601-
2021.
Opinion delivered by Justice
Goldstein. Justices Carlyle and
Breedlove participating.


Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered August 13, 2024