**Affirmed as Modified; Opinion Filed January 28, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01092-CR
### No. 05-13-01114-CR

### ROBERTO MARTIN LOURENCO, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 6
Dallas County, Texas
Trial Court Cause Nos. F12-54932-X and F12-54842-X**

## OPINION
Before Justices Bridges, Lang-Miers, and Myers
Opinion by Justice Myers

A jury convicted appellant Roberto Martin Lourenco of continuous sexual abuse of a child under the age of fourteen and aggravated sexual assault of a child under the age of fourteen, and imposed punishment of concurrent terms of 75 years in prison. In his appeal from the conviction for continuous sexual abuse of a child, cause number 05–13–01114–CR, appellant alleges an expert witness impermissibly conveyed to the jury that the complainant was telling the truth. In the aggravated sexual assault of a child appeal, cause 05–13–01092–CR, appellant contends (1) the trial court erred by failing to define serious bodily injury in the jury charge; (2) the trial court improperly instructed the jury and thereby violated appellant's right to a unanimous jury verdict; (3) the evidence was insufficient to prove, as alleged in the indictment, that appellant placed the complainant in fear that death, serious bodily injury, and kidnapping would be imminently inflicted on her; and (4) an expert witness impermissibly conveyed to the

jury that the complainant was telling the truth. As modified, we affirm the trial court's judgments.

## BACKGROUND

M, the complainant in 05–13–01114–CR, seventeen years old at the time of trial, was born in Angola, Africa on December 10, 1995. In 2004, she and her sister R moved to the United States to live with their biological father, appellant, appellant's girlfriend, Cherie, and Cherie's son. About a year after she moved to the U.S., however, appellant began doing things to M that made her feel uncomfortable. One of the first incidents M could recall occurred when appellant called M and her sister R into his bedroom. He told them to go to his bathroom and put soap and water on their hands, and then to "start touching" his penis. M recalled that most of the time she "just touched his balls," but sometimes appellant would have her masturbate him by moving her hand up and down his penis. M testified that this abuse, which started when she was about eight or nine years old, "happened many times," perhaps two or three times a week, and continued until she was about thirteen or fourteen years of age. When M was around ten years of age, appellant started having sexual intercourse with her, and this continued approximately once or twice a week until M was fourteen years of age. M told the jury that when she and the other children got into trouble, appellant would sometimes hit them with a belt or kick them. M also testified that appellant once hit her with a wooden stick, and that he sometimes slapped her on the side of her head.

When M was sixteen years old, she told her boyfriend, Jason Ukandu, via text message that appellant raped her when she was young, and that she was worried this was happening to her younger sister, E. M told her boyfriend she had seen bruises and a "hickey" on E. Ukandu, who recalled that this conversation occurred in approximately April of 2012, testified that on the following morning he notified the school's resource officer, Officer Tanya Evans of the

–2–

Richardson Police Department. Evans contacted her sergeant and an investigator for assistance. After M returned from school later that day, Dallas patrol officers went to her home to talk to her. M and her sister were taken to the Dallas Children's Advocacy Center (DCAC), and M was interviewed there on April 19, 2012 by Kaitlyn Clevenger—at that time a forensic interviewer at the DCAC.

Clevenger testified that M described multiple instances of sexual abuse and identified appellant, her father, as the perpetrator. One incident that occurred when M was fourteen years of age involved appellant telling M to take off her clothes and get into bed. Appellant got behind her and put his penis in her vagina. He stopped when M told him he was hurting her. M described another incident that took place when she was in the sixth grade and thirteen years of age. Appellant came into her room and asked her to take off her clothes, and he said that he "just wanted to look at her vagina." After M complied, appellant told her to get on her stomach. He got behind her and put his penis into her "butt." M told appellant that this was hurting her. Appellant continued the penetration "for a little while longer," after which he stopped, rolled M over onto her back, got on top of her, and put his penis in her vagina. M also told Clevenger about the "multiple times that her father would make her masturbate him." M said that she would know she was supposed to go into appellant's room and masturbate him because he would whistle at her or call her name, and that he would leave the water running in the sink for her to put soap on her hands before masturbating him. Yet another incident occurred when appellant was laying on the bed. He asked M to touch the head of his penis and squeeze it with her hands, and at some point he got up from the bed, went over to the side of the bed, and "hump[ed] the side of the bed until the sperm went on the sheets and the comforters." When Clevenger asked M how many times appellant put his penis in her vagina, M said "it was too many to count." M also said that appellant "put his penis inside her butt about two or three different times."

–3–

Kathy Dumond, a clinical supervisor and therapist at the DCAC, testified that once a child makes an outcry of abuse at the DCAC, the child is referred to therapy. Dumond told the jury that she first treated M during a May 2012 "crisis session," which was based on concerns M had suicidal or self-harming thoughts. Group therapy with another therapist at the DCAC followed, and beginning in September, 2012, Dumond began treating M in individual therapy sessions. Dumond had about thirty sessions with M by the time of trial, and was still seeing M regularly.[1]

M's younger sister, E, the complainant in 05–13–01092–CR, thirteen years old at the time of trial, testified that she was born in Angola on December 2, 1999. She moved to the United States to live with appellant in 2011. E recalled an incident where appellant asked her to bring his phone into his bedroom, and after she entered the room appellant locked the door, and he started "doing bad stuff" to E by touching her "boobs" and her "booty." During her testimony, the prosecutor showed E an anatomical drawing of a small, male child and asked her to circle the part of the body appellant used to touch her. She circled the male child's genital area, and identified that part of the body as "[p]rivate." She was then asked to circle on a drawing of a small, female child the parts of her body that appellant touched. E circled the breasts, genital, and anal areas. After the drawings, State's exhibits 8 and 9, were admitted into evidence without objection, the prosecutor asked, "Now [E], you told us that the Defendant used his private part to touch your private part; is that right." E replied, "Yes, ma'am. E testified that this type of behavior happened more than once—perhaps two or three times.

The first instance of sexual abuse E could remember occurred when she was in the living room with her sisters. Appellant called for her. He asked, "Can I touch your private part?" E recalled that she "was really scared and didn't want to say like nothing, no or nothing," so she

---

[1] Dumond's testimony is the basis for appellant's sole issue in cause 05-13-01114-CR.

told appellant, "I don't care." He then took her to his bedroom, where he touched her "boobs" with his hand. Later, when E was sleeping, appellant took off her pajama pants. She was awakened when she felt appellant trying put "his private parts" in her "private part." She asked appellant what he was doing, and he "did it" again—tried to touch his "private part" to her "private part." She remembered it felt "[n]asty" and that it hurt when appellant did this. E told appellant to leave her alone.

E recalled another incident where she came home from school one day and appellant, who was at home eating lunch, asked her to come into his bedroom. She tried to escape him by running around the room, but appellant put his hand over her mouth when she started screaming. She fought with him and tried to push him away as he attempted to put "his private parts" in her "private part." Appellant responded by slapping her face. Then she bit his arm and went to her room. She testified that she thought appellant was going to harm her, and that she was afraid. E remembered she had a "hickey" mark on her face after the fight, and that appellant scratched her legs when he was slapping her.

E testified that she was afraid to tell anyone about the abuse because she feared she might be separated from her family, and that appellant told her if anyone discovered what he was doing, she would not have a family. She recalled that when she told appellant to stop mistreating her, he said he did not care if he went to jail. Ultimately, E decided to tell an older sister, M, about the abuse, and the two of them planned to run away from home. Before they could execute their plan, however, the police came to their residence.

Yesenia Gonzalez, a supervisor of the forensic interview program at the DCAC, interviewed E on April 24, 2012. Gonzalez testified that E described several acts of sexual abuse committed by appellant, including one incident that occurred when E was sleeping in the living room. On that occasion, appellant took her into his bedroom and told her he was going to sleep

with her. E fought back when appellant tried to touch her, and after she hit appellant, he struck E on the face and body. Appellant also "covered her mouth to where she couldn't breathe, because she was trying to yell," but he eventually gave up and E left the bedroom.

The second incident that E described to Gonzalez happened one day when E was at home from school because she was sick, and her sisters were staying late at school. E was in her bedroom using the computer and appellant was at home watching a soccer game. During a break in the game, he came into E's room, removed her clothing, put her on the floor, got on top of her, and then put his penis inside of her. E told Gonzalez she felt pain when appellant did that, and that when appellant noticed it was time for E's sisters to come home from school, he stopped. As he was concluding the penetration, appellant grabbed and scratched E's breast. E said she was crying and that after appellant left to pick up E's sisters from school, she took a shower.

The third incident occurred on a day when E came home from school before her sisters. Appellant asked E to go to his bedroom and get his phone. He followed her into the room, locked the door, and tried to touch her. E recalled that she grabbed something and hit appellant with it, and that appellant hit her face and body. E also bit appellant. They struggled for a time until appellant finally gave up and stopped.

The last incident took place one day when appellant asked E, who did not like the food served at school, if she wanted appellant to buy her something to eat. After she said, "Yes," appellant told her that, in exchange for appellant buying her food, he was going to touch her. When E said, "No," appellant hit her. E bit appellant; he bit her back and hit her. Appellant continued hitting E "until he finally stopped." Gonzalez added, "I think she said she yelled or screamed and her sisters came in and took her out of the room." E also told Gonzalez about an occasion where E and her sisters went through a window to get out of the house, but decided to return and were disciplined for leaving the house.

–6–

Sylvia Morris, a licensed professional counselor and intern at the DCAC, testified that E was referred to her for continued treatment at the end of April, 2013, after another DCAC therapist that had been treating E, Julie Espy, left the DCAC. Morris told the jury she had approximately eight sessions with E. During those sessions, Morris tried to find activities to help E "process the trauma of sexual abuse that she experienced in order to help her heal." Morris described E's behavior in the therapy sessions as showing that she was "working through anger and anxiety." Asked whether she talked to the child about her anxiety of coming to court, Morris responded: "Yes. She had increased anxiety as this was approaching, fears and anxieties about facing her abuser."[2]

Dr. Matthew Cox, employed by the University of Texas Southwestern Medical School Pediatrics Department, specialized in child abuse pediatrics and conducted sexual abuse evaluations. He testified that on April 30, 2012, he conducted sexual assault examinations of both M and E at the REACH (Referral and Evaluation of At-Risk Children) clinic. M's patient history showed she had been referred to the REACH clinic after she told a friend there was sexual contact at home. She also reported changes in her sleep patterns and had "suicidal ideations." Sixteen years old on the date of the exam, M told Dr. Cox she had pain when urinating, and that this would occur "after it happened with [appellant]." She also reported that she experienced vaginal bleeding after a couple of the sexual episodes with appellant. She reported that when she had sexual encounters with her peers, she did not have pain or bleeding. Dr. Cox's examination of M revealed that a section of M's hymen was absent. The absence of tissue indicated to Dr. Cox that M suffered "some type of penetrating injury previously" that did not heal on its own. Dr. Cox could not determine when the injury occurred, not having seen what M "looked like before." He also noted that the injury to M's hymen could have occurred as

_____

[2] Morris's testimony is the basis for appellant's fourth issue in cause 05-13-01092-CR.

–7–

little as five days earlier, since it was the type of injury that can heal quickly, or it could have been years old. Because M told Dr. Cox that when she had sexual intercourse with people other than appellant, she had no pain or bleeding, Dr. Cox concluded "it would be more likely the injury would have occurred from the sexual contact with her father based on her description of the symptoms." Dr. Cox clarified on cross-examination that his findings indicated M had two other sexual partners who were peers.

Dr. Cox testified that E's patient history showed that she had described some sexual contact and was referred to the REACH clinic for a medical evaluation. She also reported having nightmares, and her physical examination revealed that her hymen "was not normal." It was "kind of moon-shaped," but thin, and the amount of tissue was less than Dr. Cox "would normally expect." In addition, E's hymen had a deep notch "with a small amount of tissue at the base." The hymen was not torn all the way through, but the tear was nearly complete, "with just a small amount of tissue at the base." Dr. Cox concluded a deep notch like that was unusual. As for whether it indicated a penetration injury, he testified:

> It raises that concern. Because it has a little bit of tissue at the base, we categorize that more as an indeterminate finding.
>
> But if the child describes a sexual encounter, then it could be a result of that. But by itself, it's not as definitive as a transection, like [M] had. But it can represent an injury, if there's a history describing some penetrating event.

Dr. Cox read to the jury his written medical assessment, which concluded:

> 12 year old girl with concerns of sexual abuse. Medical examination identified concerns of a deep notch of the hymen with small amount of tissue at the base. This finding raises concern of a prior penetrating injury. The diagnosis of child sexual abuse is dependent on the history provided by the child.

Dr. Cox testified on redirect that there was no other sexual contact described by E to explain the abnormal examination results.

Appellant, forty-four years old when he testified, was born in Malange City, Angola, and

came to the United States in 2001 at the age of thirty-two. His daughters initially remained in Angola with their mother, but after appellant was granted asylum he arranged for them to be brought to the U.S. M and her twin sister R moved to the U.S. in 2004; E followed in 2011. Appellant testified that, at first, he, his daughters, and Cherie were a happy family. But appellant started to notice "bad behavior, really bad behavior," in the girls after he and Cherie separated. Appellant learned from a neighbor that his daughters were not following his rules—leaving school, coming home, putting on makeup, high heels, and then going out and not returning until 9 o'clock at night. Appellant also started noticing that his daughters were hiding things from him. He told the girls they must focus on their education and that they could not have boyfriends, and he did not allow them to sleep overnight in their friends' homes. He did not want them to wear shorts because shorts would show their bodies. Asked about some of the punishments he would administer if the girls did not follow his rules, appellant said: "Basically, I don't have a specific punishment. It depends on what they do. I can whip the [sic] with a belt or one of the things I always told them, 'If you guys don't behave, one day I'm going to send you back to Angola.'" Appellant testified he told them that "[s]everal times." Appellant also said he would take away certain privileges such as use of the computer and telephone.

Appellant testified that E had behavioral and mental problems. He said that she got into fights with her sisters and was combative, and that he considered taking E to a psychiatrist because she fantasized that her mother, who lived in Africa, was with them in appellant's home. Appellant testified that none of E's and M's allegations of sexual abuse were true, that he never touched E or M inappropriately, never asked them to touch his privates or masturbate him, nor did he have sexual intercourse with them. Appellant also testified that he never forced E to have sex with him or threatened her in order to force her to have sex with him. Appellant said he was shocked when he learned about the accusations against him and that he could not believe it

because he thought he and his daughters "had a pretty good relationship." Asked if there was any reason his daughters would fabricate these allegations, appellant testified that they may have done so because of the restrictions and punishments he imposed on them—not being allowed to wear makeup, for example, and threatening to send them back to Angola if they misbehaved. Appellant testified that, on one occasion, he used a belt and "had to whip" both of his daughters because he came home for lunch and found two boys in the house. One of the boys told appellant that he came to talk to M; appellant told him that M did not need his friendship and he was never to set foot in the house again. Appellant also testified that his daughters' claims of having sex with him two or three times a week when they were living with Cherie could not be true. Appellant noted that the girls spent all day with Cheri, who took them to school and brought them home in the afternoon, and that the entire family was together from 5:00 o'clock in the evening until 9:00 o'clock at night, when Cherie would go to work. Appellant denied telling M that she would become a prostitute because of what he was doing to her.

## DISCUSSION

### I. Cause 05–13–01114–CR

*Cathy Dumond's Testimony*

In his only issue raised in cause 05–13–01114–CR, appellant contends that by referring to M's "trauma of being abused" and her nightmares of "being re-attacked," Dumond implicitly testified that she believed M's allegations were true. During her redirect testimony, Dumond testified as follows:

> Q. [PROSECUTOR:] Ms. Dumond, do you believe [M]'s problems stem from moving here from another country?
>
> A. I believe that would not be the only thing that's causing her problems, if it is causing.
>
> Q. But there's something else that you think is the cause, root cause of a lot of her issues?

–10–

A. Yes.

Q. What is that?

A. *The trauma of being abused.*

Q. You mentioned nightmares. Is that something that [M] dealt with in your sessions?

A. Yes.

Q. What was her problem with nightmares?

A. She had nightmares of being killed. She had nightmares of her father killing her. She had nightmares of *being re-attacked* in her sleep.

Q. And those are things that you all discussed in her therapy sessions?

A. Yes [emphasis added].

Appellant did not object to this testimony. To preserve a complaint for appellate review, a specific and timely request, objection, or motion must be made to the trial court. TEX. R. APP. P. 33.1(a); *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012) (stating that a party should object as soon as that party knows or should know that an error has occurred). Because appellant did not object during or at the conclusion of Dumond's testimony concerning M's trauma of being abused or her nightmares of being re-attacked, the issue was not preserved for appellate review. We overrule appellant's issue.

## II. Cause 05–13–01092–CR

### *Sufficiency of the Evidence*

In his third issue in cause 05–13–01092–CR, appellant argues that the evidence is insufficient to prove appellant put E in fear of death, serious bodily injury and kidnapping, as alleged in the indictment. In reviewing a challenge to the sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894–95

–11–

(Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.).  We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony.  *See Jackson*, 443 U.S. at 326.

The indictment in 05–13–01092–CR alleges that on or about February 15, 2012, appellant did:

> unlawfully then and there intentionally and knowing cause the contact and penetration of the female sexual organ of [E], a child, hereinafter called complainant, who was not then the spouse of defendant, by an object, to-wit:  the sexual organ of defendant, and at the time of the offense, complainant was younger than 14 years of age, and further, said defendant, by acts and words, did place complainant in fear that death, serious bodily injury, and kidnapping would be imminently inflicted on complainant.

Section 22.021 of the Texas Penal Code, which defines the offense of aggravated sexual assault of a child, provides in relevant part:

> (a) A person commits an offense:
>
>> (1) if the person:
>>
>> (B) intentionally or knowingly:
>>
>>> (i) causes the penetration of the anus or sexual organ of a child by any means; [or]
>>>
>>> . . .
>>>
>>> (iii) causes the sexual organ of the child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;
>>>
>>> . . .
>>>
>>> ; and
>>
>> (2) if:
>>
>> (A) the person:
>>
>>> . . .
>>>
>>> (ii) by acts or words places the victim in fear that . . . death, serious bodily injury, or kidnapping will be imminently inflicted on any person;

–12–

. . .

; [or]

(B) the victim is younger than 14 years of age[.]

TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(A)(ii), (a)(2)(B). In relevant part, then, the sexual assault defined under subsection (a)(1) becomes "aggravated" under (a)(2) if the defendant's acts or words place the victim in fear of the imminent infliction of death, serious bodily injury, or kidnapping, or if the victim is a child younger than 14 years of age. *Moreno v. State*, 413 S.W.3d 119, 128 (Tex. App.—San Antonio 2013, no pet.) (citing TEX. PENAL CODE ANN. § 22.021(a)(2)(A)–(C)).

Aggravated sexual assault is a first degree felony offense punishable by imprisonment for life or for any term of not more than 99 years or less than five, and a $10,000 fine. TEX. PENAL CODE ANN. § 12.32. However, the minimum term of imprisonment is increased to 25 years if the victim is younger than 14 years of age *and* the offense is committed "in a manner described by subsection (a)(2)(A)," *e.g.*, placing victim in fear that death, serious bodily injury, or kidnapping will be imminently inflicted. *See id*. § 22.021(f)(2). "Commission of the offense under subsection (f)(2), which effectively replaces the 'or' between subsection (a)(2)(A) and (a)(2)(B) with an 'and,'" is what the defendant in this case was charged with. *See Moreno*, 413 S.W.3d at 128 (referring to this as "super" aggravated sexual assault of a child).

The testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Benton v. State*, 237 S.W.3d 400, 404 (Tex. App.—Waco 2007, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). A child victim is not required to be specific about the dates the abuse occurred. *See Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006) ("Especially where

–13–

young children are involved, we have cautioned that courts cannot impose unrealistic expectations regarding proof of when an offense actually occurred[.]"); *Sledge v. State*, 953 S.W.2d 253, 256 n. 8 (Tex. Crim. App. 1997) ("[I]t is not often that a child knows, even within a few days, the date that she was sexually assaulted.").

Appellant does not challenge the sufficiency of the evidence regarding the elements of sexual assault; rather, the dispute concerns whether there is sufficient evidence he placed E in fear that death, serious bodily injury, or kidnapping would be imminently inflicted on her. In determining whether the State established the aggravating element of the offense, the jury was required to assess whether the complainant was fearful, whether appellant's conduct caused that fear, and whether the complainant's fear was a reasonable result of appellant's conduct. *Grunsfeld v. State*, 813 S.W.2d 158, 162 (Tex. App.—Dallas 1991), *aff'd*, 843 S.W.2d 521 (Tex. Crim. App. 1992); *Whitten v. State*, Nos. 05–08–01141–CR & 05–08–01142–CR, 2009 WL 2246128, at *7 (Tex. App.—Dallas July 29, 2009, no pet.) (not designated for publication). The first element, whether the complainant was in fact fearful, is usually established by the complainant's testimony. *Douglas v. State*, 740 S.W.2d 890, 891 (Tex. App.—El Paso 1987, no pet.); *Whitten*, 2009 WL 2246128, at *7. In examining the second and third elements, the jury may consider appellant's objective conduct, i.e., acts, words, or deeds, and infer from the totality of the circumstances whether his overall conduct was the producing cause of the complainant's fear and whether the subjective state of fear was reasonable in light of such conduct. *Brown v. State*, 960 S.W.2d 265, 268 (Tex. App.—Corpus Christi 1997, no pet.); *Whitten*, 2009 WL 2246128, at *7.

It is not necessary to show the threat of serious bodily injury or death was communicated verbally, nor is it necessary to show the defendant could have inflicted serious bodily injury, but did not. *See Lewis v. State*, 984 S.W.2d 732, 734 (Tex. App.—Fort Worth 1998, pet. ref'd);

–14–

*Mata v. State*, 952 S.W.2d 30, 32 (Tex. App.—San Antonio 1997, no pet.); *Whitten*, 2009 WL 2246128, at *7. The complainant need not use the exact words, "I was afraid." *Selvog v. State*, 895 S.W.2d 879, 882 (Tex. App.—Texarkana 1995, pet. ref'd); *Whitten*, 2009 WL 2246128, at *7. When the objective facts of the assault would naturally cause the complainant to fear for her life or serious bodily injury, as where a deadly weapon, explicit threats, or excessive force or violence are used, it is reasonable to assume the complainant had the requisite level of fear in the absence of some specific evidence to the contrary. *Brown*, 960 S.W.2d at 268; *Whitten*, 2009 WL 2246128, at *7.

The complainant in 05–13–01092–CR, E, a thirteen year old girl, testified that, at first, the thought of having sexual contact with appellant frightened her into submission. One of the first instances of abuse she could recall occurred when appellant told her he wanted to touch her "private part." She testified: "I was scared and I didn't want to say like nothing, no or nothing. So I was really scared and I say, 'I don't care.'" E described vaginal intercourse with appellant as painful. She also testified that when she tried to prevent appellant from "hurting" her by fighting back, he slapped her face. In her outcry to Yesenia Gonzalez, E reported that appellant locked her inside his bedroom, and that appellant restrained E when she screamed and attempted to escape. When he tried to have sexual contact with her, he hit her in the face and then covered her mouth. In her outcry, E recalled that she could not breathe when appellant held his hand over her mouth. E knew she was not strong enough to fight off appellant's sexual advances; she defended herself by biting him. Appellant reacted by slapping her face, which left a mark others mistook for a "hickey." E testified that appellant told her that if she spoke to anyone about what he was doing to her, she would not have a family. She also told the jury that "I was scared because I don't want to lose my daddy and I didn't want to lose my sisters." Dr. Cox found a deep notch on E's hymen that, combined with E's outcry of sexual abuse, could represent a

penetration injury.

Viewed in the light most favorable to the verdict, the evidence of appellant's conduct, such as slapping E and placing his hand over her mouth until she felt that she could not breathe, along with the other objective facts surrounding the sexual assault, including appellant's superior strength, is sufficient to establish that his conduct was the cause of the complainant's fear and that E's fear was a reasonable result of the conduct. Therefore, we conclude the evidence is sufficient to establish that, while appellant committed the sexual assault, by acts or words he placed E in fear that death, serious bodily, or kidnapping would be imminently inflicted upon her. We overrule appellant's third issue.

### Failing to Define Serious Bodily Injury in the Jury Charge

In his first issue, appellant argues that the trial court erred by failing to define "serious bodily injury" in the jury charge. The application portion of the jury charge in this case reads in part as follows:

> Now, bearing in mind the foregoing instructions, if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, Roberto Martin Lourenco, on or about the 15th day of February 2012, in the County of Dallas and State of Texas, did unlawfully then and there, intentionally or knowingly, cause the contact or penetration of the female sexual organ of [E], a child hereinafter called complainant, who was not the spouse of the defendant, by an object, to-wit: the sexual organ of defendant, and at the time of the offense, complainant was younger than 14 years of age, and further, said defendant by acts and words, did place complainant in fear that death, *serious bodily injury* or kidnapping would be imminently inflicted on complainant, then you will find the defendant guilty of the offense of Aggravated Sexual Assault, as charged in the indictment.

> Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, or if you are unable to agree, you will next consider whether the defendant is guilty of the lesser included offense of Aggravated Sexual Assault of a Child without placing complainant in fear that death, *serious bodily injury* or kidnapping would be imminently inflicted on complainant. The elements of Aggravated Sexual Assault of a Child are set forth above.

> Now, bearing in mind the foregoing instructions, if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, Roberto Martin Lourenco, on or about the 15th day of February 2012, in the County of Dallas and

State of Texas, did unlawfully then and there, intentionally or knowingly, cause the contact or penetration of the female sexual organ of [E], a child hereinafter called complainant, who was not the spouse of the defendant, by an object, to-wit: the sexual organ of defendant, and at the time of the offense, complainant was younger than 14 years of age, then you will find the defendant guilty of the offense of Aggravated Sexual Assault, as included in the indictment [emphasis added].

Nowhere in the charge, however, is the term "serious bodily injury" defined.

The trial court is responsible for delivering to the jury "a written charge distinctly setting forth the law applicable to the case. . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14. If a phrase, term, or word that the jury must use to properly resolve an issue is statutorily defined, the trial court must submit the statutory definition to the jury. *Arline v. State*, 721 S.W.2d 348, 352 n. 4 (Tex. Crim. App. 1986) (stating "a statutorily defined word or phrase must be included in the charge as part of the 'law applicable to the case'"). The Texas Penal Code defines "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. §1.07(a)(46). Thus, the trial court was required to submit the statutory definition of "serious bodily injury" to the jury. *See Parsons v. State*, 191 S.W.3d 862, 864 (Tex. App.—Waco 2006, pet. ref'd) (trial court should have included definition of "serious bodily injury" in jury charge in aggravated assault prosecution, but appellant did not suffer egregious harm because term was used only in defensive portion of instructions on law of self-defense, and jury was not misled by omission of definition). The trial court's failure to do so was error.

Appellant, however, did not object to the lack of a "serious bodily injury" definition in the charge when it was submitted to the jury. Nor did he object when the trial court received a jury note asking for a definition of the term, and the court ordered the deliberations to continue

without it.[3]  Unobjected-to charge error will not result in reversal of a conviction in the absence of egregious harm.  *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).  In examining the record for egregious harm, we must consider (1) the entire jury charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the final arguments of the parties, and (4) any other relevant information revealed by the record of the trial as a whole.  *Allen*, 253 S.W.3d at 264; *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.  Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Allen*, 253 S.W.3d at 264; *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

Applying these factors, we find no indication that "serious bodily injury" was a contested issue at trial.  A review of the arguments of counsel, the examination of witnesses, and the voir dire examination shows no mention of the term.  Additionally, looking at the evidence, appellant's defense was a complete denial of E's allegations.  He argued she was lying because she was a rebellious girl who wanted to be free of his restrictions.  On cross-examination, when asked if he saw E break down on the witness stand as she discussed the abuse he allegedly inflicted on her, appellant testified, "I didn't do nothing to her."  Asked about the medical evidence, he said, "No, it is not true.  The allegations are not true."  Referring to Dr. Cox's testimony regarding the deep notch in E's hymen, the prosecutor asked appellant, "But you want this jury to believe that's just not true, what the doctor said?"  Appellant replied, "No, I don't want them to believe that.  I just don't want them—I just want them to know that I don't have

_____

[3] The note from the jury asked, "What is the definition of serious bodily injury?"  The trial court's written response stated, "You have all the law and evidence that you are entitled to.  Continue to deliberate."

nothing to do with it." The prosecutor then asked, "You don't have anything to do with it; okay." Appellant responded, "That's correct." Appellant similarly testified, referring to Dr. Cox's medical assessment of E, that he heard Dr. Cox say he could not tell if E's injury was caused by penetration, and that the doctor was not sure. As for the jury charge, it also authorized the jury to convict appellant of the charged offense based on an imminent infliction of death or kidnapping, neither of which were defined, and the jury was authorized to convict appellant of the lesser included offense of aggravated sexual assault of a child without placing complainant in fear that death, serious bodily injury or kidnapping would be imminently inflicted on her. We therefore cannot conclude, given the jury charge, the evidence, the arguments of counsel, and other relevant information, that appellant suffered egregious harm. We overrule appellant's first issue.

### *Violation of Appellant's Right to a Unanimous Jury Verdict*

In his second issue, appellant contends that the disjunctive submission in the jury charge regarding placing the victim in fear of imminent death, serious bodily injury, *or* kidnapping, violated his right to a unanimous jury verdict. Appellant argues that, because of the disjunctive jury instruction, the jury was never required to unanimously agree on whether he placed the complainant in fear of death, serious bodily injury, or kidnapping.

A jury must be unanimous in finding every constituent element of the charged offense in all criminal cases. *See Jourdan v. State*, 428 S.W.3d 86, 94 (Tex. Crim. App. 2014). Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). The requirement of jury unanimity is not violated by a jury charge that presents the jury with the option of choosing among various alternative manner and means of committing the same offense. *Jourdan*, 428 S.W.3d at 94. "'Therefore, different modes of commission may be

–19–

presented in a jury instruction in the disjunctive when the charging instrument, in a single count, alleged the different means in the conjunctive.'" *Id.* (quoting *Pizzo v. State*, 235 S.W.3d 711, 715 (Tex. Crim. App. 2007)); *see also Hudson v. State*, No. PD–1699–13, 2014 WL 6983248, at *2 n. 4 (Tex. Crim. App. Dec. 10, 2014) ("Different methods of committing an offense that are alleged in the conjunctive in an indictment may generally be alleged in the disjunctive in the jury charge.").

Subsection (f)(2) of section 22.021 provides for a 25-year minimum term of imprisonment if the victim is a child younger than 14 years of age and the offense was committed "in a manner described by Subsection (a)(2)(A)"—thereby recognizing that the alternatives listed under subsection (a)(2)(A) are different manners of committing the offense of aggravated sexual assault of a child. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(ii), (f)(2). The application paragraph of the jury charge, as quoted earlier, instructed the jurors that they could convict appellant of aggravated sexual assault if they found he committed sexual assault and that, at the time of the offense, the complainant was younger than 14 years of age, and further, that he placed the complainant in fear that death, serious bodily injury, *or* kidnapping would be imminently inflicted on the complainant. The charge, in other words, submitted the aggravating features of the statute disjunctively. Whether appellant placed the complainant in fear of death or serious bodily injury or kidnapping during the course of the sexual assault, only a single crime of aggravated sexual assault was committed. The aggravating elements were simply alternative methods of committing the same offense. Hence, the trial court did not err by submitting the aggravating elements disjunctively. *See Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (concluding aggravating elements of capital murder were alternative methods of committing same offense and trial court did not err by submitting the elements disjunctively); *see also DeLeon v. State*, No. 13–08–00170–CR, 2009 WL 4909434, at *3 (Tex.

–20–

App.—Corpus Christi Dec. 21, 2009, no pet.) (mem. op., not designated for publication); *Davis v. State*, No. 05–05–01694–CR, 2007 WL 122138, at *6 (Tex. App.—Dallas Jan. 18, 2007, no pet.) (not designated for publication). Having determined that the jury instruction was not erroneous, we need not decide whether appellant suffered egregious harm. *See Ngo*, 175 S.W.3d at 743-44. We overrule appellant's second issue.

### *Sylvia Morris's Testimony*

In his fourth issue, appellant argues that by referring to the trauma of the sexual abuse that E "experienced," and E's anxiety caused by "facing her abuser" when coming to court, Morris implicitly testified that she believed E's allegations were true. The relevant portion of the record reads as follows:

> Q. [PROSECUTOR:] And what type of activities are you doing with [E] in your sessions?
>
> A. [MORRIS:] We're just finding activities to help [E] process the trauma of sexual abuse *that she experienced* in order to help her heal.
>
> Q. What types of activities do you do?
>
> A. Any activities that help her express her emotions, her thoughts and feelings that she's having. So anything to work with her hands, if she can't verbalize how she's feeling, face charts or different activities that help her express how she's feeling.
>
> Q. And how would you describe her behavior and demeanor in your therapy sessions?
>
> A. She is working through anger and anxiety, still working with those.
>
> Q. And did you talk with her about anxiety of coming to court?
>
> A. Yes. She had increased anxiety as this was approaching, fears and anxieties about *facing her abuser* [emphasis added].

Appellant did not object to this testimony. To preserve a complaint for appellate review, a specific and timely request, objection, or motion must be made to the trial court. TEX. R. APP. P. 33.1(a); *Lackey*, 364 S.W.3d at 843. Because appellant did not object during or at the

–21–

conclusion of Morris's testimony regarding the trauma E "experienced," or her anxiety of "facing her abuser," the issue was not preserved for appellate review. We overrule appellant's fourth issue.

### III. Modification of Judgments

The judgments in both of the above cases incorrectly state that the "Sex Offender Registration Requirements do not apply to the Defendant," and they do not state the age of the victim at the time of the offense. Appellant's convictions for aggravated sexual assault of a child under the age of fourteen and continuous sexual abuse of a child under the age of fourteen are among those defined as a "[r]eportable conviction or adjudication" for purposes of the sex offender registration statute. *See* TEX. CODE CRIM. PROC. ANN. art. 62.001(5)(A) (stating, in part, that a conviction based on a violation of section 21.02, continuous sexual abuse of a child, or of section 22.021, aggravated sexual assault, is a "[r]eportable convictions or adjudication"). As a person who has a reportable conviction or adjudication, appellant would be subject to the registration requirements of that program. *See id.* art. 62.051.

As alleged in the indictments and proven in this case, the victims were younger than fourteen years of age on the alleged dates of the offenses. Because there is sufficient evidence to support the conviction in each case, and because the offense in each case required a showing that the age of the victim was younger than fourteen, on our own motion we modify the judgments in 05–13–01114–CR and 05–13–01092–CR to show that the sex offender registration requirements apply and that the age of the victim at the time of the offense was younger than fourteen years of age. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (appellate court has authority to modify incorrect judgments *sua sponte* when the necessary information is available to do so); *see also Tyler v. State*, 137 S.W.3d 261, 267–68 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (authority to modify judgment not dependent

upon a party's request); *Ruiz v. State*, No. 05–12–01703–CR & 05–12–01704–CR, 2014 WL 2993820, at *12 (Tex. App.—Dallas June 30, 2014, no pet.) (not designated for publication) (modifying judgments to show applicability of sex offender registration requirements and that age of victim at time of offense was younger than 14 years of age because evidence was sufficient to support convictions in each of the counts, which required a showing that age of victim was younger than fourteen years of age); *Medlock v. State*, No. 05–11–00668–CR, 2012 WL 4125922, *1–2 (Tex. App.—Dallas Sept. 20, 2012, no pet.) (mem. op., not designated for publication) (same); *Johnson v. State*, No. 05–06–00037–CR, 2007 WL 60775, at *7 (Tex. App.—Dallas Jan. 10, 2007, no pet.) (not designated for publication) (same).

As modified, the trial court's judgments are affirmed.


/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
131092F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ROBERTO MARTIN LOURENCO,
Appellant

No. 05-13-01092-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F12-54932-X.
Opinion delivered by Justice Myers. Justices
Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62" should be changed to "Sex Offender Registration Requirements apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62"

"The age of the victim at the time of the offense was" should be changed to "The age of the victim at the time of the offense was younger than 14 years of age"

As **MODIFIED**, the judgment is **AFFIRMED**. We direct the trial court to prepare a new judgment that reflects these modifications.

Judgment entered this 28th day of January, 2015.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ROBERTO MARTIN LOURENCO, Appellant

No. 05-13-01114-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F12-54842-X.
Opinion delivered by Justice Myers. Justices Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62" should be changed to "Sex Offender Registration Requirements apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62"

"The age of the victim at the time of the offense was" should be changed to "The age of the victim at the time of the offense was younger than 14 years of age"

As **MODIFIED**, the judgment is **AFFIRMED**. We direct the trial court to prepare a new judgment that reflects these modifications.

Judgment entered this 28th day of January, 2015.