

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0918-20

---

### BRIAN CHRISTOPHER REED, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### BRAZOS COUNTY

---

**WALKER, J., delivered the opinion of the Court, in which KELLER, P.J., and RICHARDSON, NEWELL, SLAUGHTER, and MCCLURE, JJ., joined. HERVEY and YEARY, JJ., concurred in the result. KEEL, J., dissented.**

## O P I N I O N

The indictment charged Appellant Brian Christopher Reed with sexual assault by penetrating the victim's sexual organ with his sexual organ, but the jury convicted him of the lesser-included offense of attempted sexual assault. The jury charge's application paragraph for the lesser did not limit the means of penetration to his sexual organ, and the charge's definition of sexual assault told the jury that penetration could be committed "by any means." The jury also heard some evidence that Appellant may have used his mouth, not his sexual organ. The court of appeals concluded that

Appellant was egregiously harmed by the charge error and reversed.

Assuming, without deciding, that the charge was erroneous, we find that the court of appeals overestimated the harm because the possibility that the charge error led the jury to find Appellant guilty of attempting to sexually assault the victim with his mouth instead of his sexual organ is hypothetical at best. Although there was a conflict in the evidence over whether Appellant used his sexual organ or used his mouth, the dispute over the means of penetration was tied-up with and ancillary to the greater question of whether to believe the victim's claim that, when Appellant used his sexual organ, it was not consensual or Appellant's claim that, when he used his mouth, it was consensual. The case largely revolved around consent. Furthermore, the State did not tell the jury it could convict if it thought Appellant used his mouth. Likewise, the defense did not argue that he should be acquitted because he had committed a different offense than what he was charged with. Instead, the defense criticized the State's failure to forensically prove penetration by sexual organ. The harm does not rise to egregious harm. We reverse and remand this case to the court of appeals.

## I — Background

Texas A&M student M.K. celebrated her twenty-third birthday by spending the night out drinking in College Station with her friends.[1] The birthday group started their night out at Wings N More and ultimately ended up at a bar called The Tap.

Appellant, a refinery worker for the Valero Oil Company, was in College Station to attend work-related training. His group had ended their final day of training, and they also spent the night

---

[1] Although the record does not include a pseudonym form filed by the victim, we will refer to the victim with the pseudonym "M.K." used by the court of appeals and by the parties in their briefing to this Court. *See* TEX. CODE CRIM. PROC. Ann. arts. 58.102(a), 58.101(a)(1) (victim of a reportable offense may elect to use a pseudonym by completing a prescribed pseudonym form); art. 62.001(5)(A), (G) (reportable offenses include attempted sexual assault).

out drinking. They went to the hotel bar, a Buffalo Wild Wings, a Mexican food restaurant, and eventually ended up at The Tap. While there, M.K.'s roommate Caitlin Scott struck up a conversation with a member of Appellant's group, Trevor Allen. M.K. became intoxicated and needed to go home, and one of her friends drove M.K. and Scott back to their nearby condo.

Upon returning home, M.K. went upstairs to her bedroom. Some time later, Allen and Appellant arrived at the condo. Appellant asked Scott where the bathroom was, and she directed him upstairs while she remained downstairs with Allen. What happened when Appellant went upstairs is disputed. According to M.K., she was asleep and woke up to a man on top of her, with his penis in her vagina. M.K. screamed out Scott's name, pushed the man off, and left the room.

Scott heard M.K. yelling and went upstairs to check on her.[2] M.K. and Scott passed by each other in the hallway,[3] and M.K. went into Scott's bedroom while Scott went into M.K.'s room. When Scott went inside, she found an apologetic Appellant sitting naked on the bed. Scott yelled at him and pushed him back downstairs. Appellant dressed at the bottom of the stairs and, thinking his co-worker, Trevor Allen, had already left, walked back to his hotel.

While in Scott's room, M.K. heard Scott yelling. M.K. began to process what had happened, and she began crying and became hysterical. She called friends and her brother to report that she had been raped. One of those friends, Cassidy Jackson, had been out with M.K. earlier that night and came over right away and called 9-1-1.

---

[2] Scott did not remember what M.K. was yelling or saying. Scott recalled feeling like she needed to go upstairs.

[3] Scott and M.K.'s testimony at trial seem to indicate no words were exchanged in the hallway. Scott did not remember if she made direct contact with M.K. on her way to M.K.'s room. M.K. testified that she encountered Scott in the hallway, but M.K. did not provide any further testimony about that encounter. She told the jury that she went and sat on Scott's bed.

Jackson drove M.K. and Scott to the hospital, where M.K. was subjected to a sexual assault examination. M.K. and Scott also spoke with the investigating detective Rick Vessell, who noted that M.K. was still intoxicated. From Scott, Vessell learned that the suspect was named "Brian" and might be staying at the Hilton. Another officer was able to get confirmation from the hotel of a guest matching the description. Upon arriving at the hotel room, the officers knocked, and, after some delay, Appellant answered and allowed Vessell to come in.

After introducing himself, Vessell asked Appellant if he had gone to a house earlier that night with Allen, and Appellant answered that he was there for four or five minutes. Telling Appellant that he was not under arrest, Vessell nevertheless provided *Miranda* warnings. Vessell then informed Appellant that a naked man matching his description was in M.K.'s room having sex with her. Appellant denied being that man, and he recounted his group's night out which ended at The Tap. After leaving the bar, Appellant went with Allen over to the condo where he sat on the couch for a little bit and then went back to the hotel.

Vessell told Appellant that a lot of what Appellant said was probably the truth. But he also told Appellant that M.K. woke up to Appellant having sex with her, and that Scott saw him naked on the bed. Appellant again denied that it was him—he promised Vessell that it was not him. Then Vessell told Appellant that the suspect matched Appellant's description and that he was picked out of a photo lineup.[4] Suggesting that Appellant probably just made a mistake and noting that Scott said the person seemed genuinely remorseful, Vessell asked Appellant to tell his side of the story because this was the only chance to explain what happened when he went upstairs to use the bathroom and

---

[4] Vessell testified at trial that there was no photo identification, and he misled Appellant in order to "block his lies."

how and why he ended up naked in M.K.'s room. Vessell told Appellant "if it was consensual, it was consensual," a phrase he would use several times during the interview.

Vessell asked Appellant to walk him through what happened that night. Appellant said Allen was going to meet a woman that Allen had met at The Tap, and Appellant went along because Allen was his ride. Initially, he sat on the couch with Allen. He had to use the bathroom, and Scott told him to go upstairs. He found "some lady" in the bathroom passed out on the floor. He helped her up and flushed the commode because she had vomited. He helped her to her bedroom, and he told Vessell "yeah, everything was consensual." He could not remember what clothes M.K. was wearing when he found her, but "yeah, we had consensual sex."

Appellant asked if he was being charged with anything, but Vessell told him that he was not under arrest and they were just talking. However, Vessell did confirm Appellant's concern that M.K. was saying he raped her. Because of this, Vessell told Appellant "That's why I need your side of the story. There's two people involved in this act. She's says it wasn't consensual. You're saying it was. That's where we're at." Appellant repeated that the encounter was consensual.

Appellant further explained that he found M.K. lying on her side in the bathroom. It was her birthday, and he told her "birthday girl, you had way too much fun." She started kissing on his neck, and it "escalated from there." Vessell asked if "escalated from there" meant they had sex. He asked "Did you have vaginal intercourse?" and followed-up with several questions on where Appellant put his sexual organ. Appellant promised Vessell that he did not use his sexual organ, and "all [he] did was kiss on her."

In response to Vessell's question of how M.K. ended up naked, Appellant said she undressed herself. As for himself, he stated that he "very well could have been." Vessell asked if he was naked

because he was planning on having sex. Before Appellant could answer, Vessell asked how the encounter stopped and why M.K. left the room. Appellant "guess[ed] he wasn't doing a very good job," and he briefly chuckled. Appellant again denied using his sexual organ, and he repeated that he was only "kissing on her."

Vessell told Appellant he thought Appellant was being mostly truthful except about not penetrating M.K.'s sexual organ with his sexual organ. Vessell bluntly stated "a girl knows" and M.K. said Appellant was inside of her "actively engaged in thrusting." Vessell flatly told Appellant he did not believe his story. After Appellant said he was being "dead honest," Vessell reminded him that he initially denied being at the condo, then admitted to being in the condo but not going upstairs, then admitted to going upstairs, then admitted to being in the bed, and then admitted to being naked. Vessell needed Appellant to talk "about this penis part." Vessell warned Appellant that M.K. was currently being examined and proof would come out that Appellant really did penetrate her sexual organ with his sexual organ. Vessell predicted that Appellant would then admit to intercourse, making him look like a liar again. Vessell told Appellant to tell the truth now.

Vessell asked if it was possible that Appellant was drunk and did not notice it. Appellant said he might have "rubbed on her for a minute, maybe," but he did not remember ever doing that. All he remembered was "eating her out." Vessell, wanting "to help [Appellant] decide where [his] penis was," told Appellant that M.K. was on her period and her tampon was pushed up inside where it would not be unless something was stuck up in there, so that was more evidence Appellant's sexual organ was inside her.[5]

---

[5] Although it was true that M.K. was on her period, she did not have a tampon in at the time. On the night of the offense, M.K. initially thought her tampon was still inserted, but she testified at trial that she habitually removed any tampon when going to sleep, and the nurse at the hospital

Vessell told Appellant that he already knew everything, including that Appellant had sex with M.K., and he was giving Appellant a chance to explain. Appellant repeated that it was consensual. He said that she came on to him, and she was fine with it. After Vessell asked if Appellant would still maintain that he did not put his sexual organ in M.K. or if he would admit that it happened, Appellant responded that "it's very possible."

Appellant was indicted for sexual assault for allegedly penetrating M.K.'s sexual organ with his sexual organ without her consent. At trial, M.K. testified that she had gone to sleep right after getting home from The Tap, and she woke up with Appellant's penis in her vagina. She did not even know who Appellant was, and she did not consent to having sex with him. Appellant testified in his defense, and he told the jury what he had told to Vessell: that it was consensual and he only performed oral sex. He admitted that he was not initially truthful with Vessell because he did not want to admit that he had been unfaithful to his wife.

Following the close of evidence, the trial court held the charge conference off the record after which the State had no objections and Appellant had "[n]o further objections." The trial court gave the jury instructions which included lesser-included offenses for attempted sexual assault and assault by offensive or provocative touch. The application paragraph for the attempted sexual assault lesser-included offense tracked the statutory language and told the jury to convict Appellant if it found he had the intent to commit "Sexual Assault" and did an act that amounted to more than mere preparation that tended but failed to effect the commission of the offense intended (i.e., "Sexual Assault").[6] "Sexual Assault" was defined in the statutory language, and the jury was told that a

_____

testified that no tampon was found during the examination.

[6] *See* TEX. PENAL CODE Ann. § 15.01(a).

person commits "Sexual Assault" if he intentionally or knowingly penetrates the anus or sexual organ of another person, not his spouse, *by any means* without that person's consent.[7]

The jury convicted Appellant of the lesser-included offense of attempted sexual assault. For that third-degree felony the jury assessed a punishment of three years and six months and a $1,000 fine.

Appellant raised three issues on appeal, one of which was that the trial court's charge for the lesser-included offense of attempted sexual assault should have been limited to the indictment's allegation that Appellant used his sexual organ. *Reed v. State*, 608 S.W.3d 856, 859 (Tex. App.—Waco 2020). The court of appeals agreed and determined that the jury charge was erroneous because it expanded the theory of liability beyond the language of the indictment, and the jury could have convicted him of attempting sexual assault "by any means." *Id.* at 860. The court of appeals then found that the error caused egregious harm and accordingly reversed. *Id.* at 862.[8]

Chief Justice Gray dissented. *Id.* at 862 (Gray, C.J., dissenting). Even though he concurred that there was error in the charge, he believed the error was harmless. *Id.* at 863. Chief Justice Gray thought the jury would have to go through "mental gymnastics" in order to read "Sexual Assault" under its abstract definition for the purposes of the lesser-included offense. *Id.* Chief Justice Gray also thought that not only would such a reading go against the logical flow of the charge, the evidence and especially the parties' closing arguments weighed against a finding of egregious harm. *Id.*

---

[7] *See* TEX. PENAL CODE Ann. § 22.011(a)(1)(A).

[8] Because the charge issue was dispositive of the appeal, the court of appeals declined to address Appellant's other two issues. *Reed*, 608 S.W.3d at 862 n.3.

We granted the State's petition for discretionary review, which complains that:

> The court of appeals erred in finding egregious harm, where the record is clear that the jury understood that a conviction for the lesser included offense of attempted sexual assault would be based on Appellant's attempted penetration of the victim's sexual organ by Appellant's sexual organ.

We sustain the State's ground for review. Assuming that there was error in the charge that may have authorized the jury to convict if it found that Appellant tried but failed to penetrate the victim's sexual organ by any means other than his sexual organ, and there was some evidence that he used his mouth, that possibility is too remote for the error to have caused Appellant egregious harm.

## II — Egregious Harm

If charge error is found, the appellate court must analyze that error for harm. *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022); *Kirsch*, 357 S.W.3d at 649; *Arline*, 721 S.W.2d at 351. If the error was the subject of a timely objection, reversal is required if the error was calculated to injure the rights of the appellant, which means no more than that there must be some harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022). But if there was no proper objection to the error, a reversal will be granted only if the error presents egregious harm, meaning that the appellant did not receive a fair and impartial trial. *Almanza*, 686 S.W.2d at 171; *Cyr*, 665 S.W.3d at 556. Under either the "some harm" standard or the "egregious harm" standard, to obtain a reversal for jury charge error, the appellant must have suffered actual harm and not merely theoretical harm. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012); *Arline*, 721 S.W.2d at 352; *Campbell*, 664 S.W.3d at 245 (some harm); *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (egregious harm).

Because there was no proper objection to the error,[9] we review for egregious harm. Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007); *Alcoser*, 663 S.W.3d at 165. In determining whether charge error resulted in egregious harm, we consider: (1) the entire jury charge; (2) the state of the evidence; (3) the final arguments of the parties; and (4) any other relevant information revealed by the trial court as a whole. *Stuhler*, 218 S.W.3d at 719; *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).

### II(1) — The Entire Jury Charge

As discussed above, the court of appeals found the charge for the lesser-included offense of attempted sexual assault was erroneous because it allowed the jury to find Appellant guilty on a theory not alleged in the indictment. The court of appeals concluded that the error affected the very basis of the case and therefore was egregiously harmful. *Reed*, 608 S.W.3d at 861. As the court of appeals saw it, the instruction allowed the jury to consider penetration by any means including his mouth, and there was "a significant possibility" that Appellant was convicted without the jury's unanimous agreement that he tried, but failed, to penetrate M.K.'s sexual organ with his sexual organ. *Id.*

We do not doubt that there is a possibility that the jury, reading the instruction for the lesser-included offense of attempted sexual assault, understood "Sexual Assault" to mean "Sexual Assault" strictly as defined in the abstract portion of the charge. But is there a "significant possibility" that

---

[9] As noted above, following the off-record charge conference, Appellant's defense counsel replied that he had "[n]o further objections." Although the record contains some indication that Appellant had some objections to the court's charge, the record fails to show what Appellant's objections were and whether they were specific and timely enough to preserve error.

the jury:

1. considered the charged offense that Appellant sexually assaulted M.K. by intentionally or knowingly penetrating her sexual organ with his sexual organ without her consent;

2. decided that the evidence did not prove the charged offense beyond a reasonable doubt;

3. moved on to consider the lesser-included offense of attempted sexual assault;

4. jumped back to the first page of the court's charge for the abstract definition of "Sexual Assault";

5. and jumped forward over the charged offense's application paragraph to consider attempted sexual assault using the abstract definition?

It is possible. But as Chief Justice Gray colorfully put it:

> one has to be a mental gymnast to run past the greater offense to the lesser, and then do a back-flip back to the abstract portion of the charge for the definition of sexual assault on all the other theories for how to commit sexual assault, before then vaulting over the specific theory to land on an attempt to commit sexual assault on a theory other than the greater offense[.]

*Reed*, 608 S.W.3d at 863 (Gray, C.J., dissenting). We agree with him that "mental gymnastics" would be required of the jury to reach its verdict in such a manner. *Id.* Although it may be within the universe of possibility, we think the possibility to be theoretical at best and not "significant." *See Sanchez*, 376 S.W.3d at 775 (actual harm, not theoretical harm).

What we do find significant is the fact that the application paragraph for the charged offense ended with:

> you will find the Defendant "not guilty" of Sexual Assault and go on to consider the lesser-included offense of Attempted Sexual Assault[,]

and the application paragraph for the attempted sexual assault lesser-included offense began with:

bearing in mind the foregoing instructions[.]

We generally presume that the jury followed the trial court's instructions. *Allison v. State*, 666 S.W.3d 750, 765 (Tex. Crim. App. 2023); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) ("On appeal, we generally presume the jury follows the trial court's instructions in the manner presented."). Thus we presume that the jury, in "finding [Appellant] 'not guilty' of Sexual Assault . . . [went] on to consider the lesser-included offense of Attempted Sexual Assault," and in so considering, "[bore] in mind the foregoing instructions." While the abstract definition of "Sexual Assault" was in an earlier part of the charge and thus literally part of "the foregoing instructions," the application paragraph for the charged offense—including its sexual organ limitation—was the immediately preceding instruction that the jury had just moved on from. It is more likely that the jury, following the instruction to "bear[] in mind the foregoing instructions," understood "Sexual Assault" to mean the charged offense that it had just acquitted Appellant of.

With regard to the entire jury charge, we find that while this factor weighs in favor of a finding of some theoretical harm, it does not weigh in favor of egregious harm.

## II(2) — The State of the Evidence

Turning to the state of the evidence, the evidence relevant to the means of penetration and whether the jury could have found Appellant penetrated M.K.'s sexual organ "by any means" other than his sexual organ consisted of M.K.'s account, Appellant's account, and a pair of underwear belonging to Appellant with a notable stain.

M.K. explained that when she got home, she went straight upstairs to her bedroom and went to sleep. Although she could not specifically remember what she wore to bed that night, she would always wear the same shirt to bed with either pajama pants or just underwear. Yet when she woke

up that night, she had no underwear on, and someone was in her room and on top of her.

Officer Newton took a statement from M.K. at the condo. She told him that she woke up and pushed some guy off of her. She said the guy was completely naked and his penis was in her vagina.

M.K. told the jury that, after she spoke with responding officers at the condo, she went to the hospital where she underwent a sexual assault examination. While at the hospital, she spoke with officers there, and M.K. acknowledged that she told them that the guy was "trying to have sex" with her and that he "attempted to have sex" with her. But she added that she immediately told them that the guy's penis was inside of her.

Meghan Martin, a sexual assault nurse examiner, examined M.K. at the hospital. Martin did not remember the examination, but according to her records M.K. reported that she went to bed alone and woke up with a man on top, vaginally penetrating her. Martin explained to the jury that vaginal penetration meant, in layman's terms, that something went into M.K.'s vagina. Martin also stated that although M.K. said she was currently on her period and had a tampon in, a tampon was not found during the examination.

Rick Vessell, the investigating detective, met with M.K. at the hospital. M.K. told him that the suspect attempted to have sex with her, but Vessell explained that although that was "the expression she's using, . . . she said his penis was in her vagina." M.K. also told Vessell that the suspect tried to have sex with her, and again Vessell explained that she "also said his penis was inside of her. But it's common – that's a phrase commonly used. I've heard that before in investigations, tried to have sex with me. That doesn't mean it didn't happen."

Vessell told the jury about his interview of Appellant, which was recorded and played for the jury. Vessell asked Appellant about what happened at M.K.'s apartment. Appellant initially claimed

that he only stayed downstairs for a few minutes, but after prodding Appellant eventually told Vessell that he only performed oral sex on M.K. He denied putting his sexual organ in her sexual organ or her anus. Yet on the recording, Appellant made equivocal concessions that he might have rubbed on M.K.'s sexual organ and that it was possible that he did put his sexual organ in M.K.

Vessell was skeptical of Appellant's claim that he performed oral sex, because when Vessell was at the hospital, he learned that M.K. had reported to the nurse that she was menstruating. Vessell thought performing oral sex on a woman that was on her period was odd. Additionally, during the interview, Vessell suggested to Appellant that he might have not even noticed putting his sexual organ inside of M.K. because he was drunk, and Appellant replied that his sexual organ may have rubbed on M.K.'s sexual organ.

After the interview, Appellant gave consent for Vessell to collect some items in the hotel room, including a pair of underwear. On the day before testifying, Vessell noticed a dark colored stain on the crotch of the underwear that he had previously missed. Vessell opined that the stain looked like blood, and he found that significant because he recalled that M.K. had been menstruating at the time of the incident. The presence of menstrual blood on Appellant's underwear would be inconsistent with Appellant's story that he did not penetrate M.K.'s sexual organ with his sexual organ. The stain had not been tested, and Vessell conceded that the failure to do so was a mistake. However, Vessell said testing would not show whether there was consent; it only shows whether an act happened, and identity was not in doubt.

Nancy Downing, another sexual assault nurse examiner, testified as an expert for the State. On cross-examination, Downing opined that finding semen or sperm in the vaginal swab would be the best evidence of penetration, but male skin cells and prostate fluid ("pre-ejaculate") can support

penetration as well. On re-direct, Downing agreed that, if a victim were on her period, a large amount of discharge could dilute any foreign sample in the vagina. Downing also noted that, even if DNA were recovered, it would not show whether the encounter was consensual; DNA would only establish that two people had sexual contact and who those individuals were. Notably, Downing explained to the jury that the male sexual organ is the penis, and oral sex would not constitute penetration by a man's sexual organ. However, oral sex would constitute sexual assault under the meaning of the statute.

Appellant testified in his own defense, and he repeated what he had told to Vessell. Appellant helped M.K. to her bedroom, "one thing kind of led to another," and he performed oral sex on her. Appellant claimed that he never put his sexual organ inside of her. The State cross-examined Appellant at length and specifically asked questions aimed at impeaching his claim that he only performed oral sex. Regarding the stained underwear, Appellant explained that he did not wear that particular pair that night. Appellant said that the stain was caused by a cheap vape pen that he had in his pocket. The vape pen broke and leaked onto his underwear while he was training at the fire school.

The evidence pertaining to the element of penetration essentially consisted of, on the one hand, M.K.'s version of events in which she told the jury and others that Appellant's sexual organ was inside of hers, Appellant's apparent concession during the recorded interview that it was possible, and a stain on Appellant's underwear that Vessell thought looked like blood. On the other hand—aside from his admission at one point in the recorded interview that he might have penetrated her with his sexual organ—Appellant was largely consistent in his claim that he only performed oral sex, and he explained that the stain was caused by a broken vape pen. Finally, on what penetration

even means, the jury heard Downing explain that although oral sex does not constitute penetrating the victim's sexual organ with the suspect's sexual organ, oral sex could constitute sexual assault under the meaning of the statute.

While the jury heard a version of events where Appellant used his sexual organ as alleged in the indictment and the jury saw an exhibit that would tend to support that account, the jury also heard a version of events where Appellant used his mouth. The jury was also told that "by mouth" is included in "by any means." On the other hand, Appellant was convicted of attempted sexual assault, and the jury did not hear evidence that he only tried to use his mouth. With regard to the state of the evidence, this factor cuts both ways, and neither weights in favor of nor against a finding of egregious harm.

### II(3) — Final Argument of the Parties

During closing argument, the State reminded the jury that M.K. said she woke up with Appellant's penis inside her, and the State argued that the jury should believe M.K. over Appellant by pointing to M.K.'s consistent statements and attacking the logic of Appellant's story. Regarding the lesser-included offense of attempted sexual assault, the State argued that there was no mere attempt—Appellant's stained underwear was proof that Appellant's sexual organ had actually penetrated M.K.'s sexual organ because her menstrual blood had transferred onto his sexual organ and from there onto his underwear.

Much of Appellant's closing argument focused on the State's burden of proof regarding the charged offense and the use of Appellant's sexual organ. Defense counsel argued that the State failed to meet its burden because physical evidence was not tested for DNA. Counsel contended that, had the State tested for DNA and if Appellant's DNA was found in the sexual assault kit collected from

M.K. at the hospital, it would prove that Appellant's sexual organ had penetrated M.K.'s sexual organ. And if the stain on Appellant's underwear was tested, the results could confirm the prosecution's theory that the stain was M.K.'s menstrual blood, transferred onto the underwear by Appellant's sexual organ after penetration of M.K.'s sexual organ.

Defense counsel never put forth an argument that Appellant did not commit the offense as alleged because he used his mouth, not his sexual organ.[10] Notably, defense counsel briefly touched upon the lesser-included offenses. Counsel told the jury that "attempted sexual assault would mean that he attempted to stick his penis in her vagina and was not successful. That's what that would mean." While the jury could have disregarded counsel, the defense argument steered the jury towards the allegations of the indictment. As Chief Justice Gray noted, "[i]t could be said that the defendant actually argued the hypothetically correct jury charge." *Reed*, 608 S.W.3d at 863 (Gray, C.J., dissenting).

The State's rebuttal argument focused on attacking Appellant's credibility and building up M.K.'s credibility. The State again told the jury that M.K. said she woke up with Appellant inside of her and she pushed him off, and the State frequently pointed to the stained underwear as proof. Admitting that it should have been tested, the State argued that there was no time for testing because the stain had been noticed shortly before trial. Nevertheless, the State argued that testing was not necessary because the issue was consent, not identity. The State also used the stained underwear as an opportunity to attack Appellant's credibility by contending that his explanation for the stain (vape

---

[10] The remainder of the defense argument tried to shore up Appellant's credibility by explaining that Appellant's hesitant and inconsistent statements to Vessell were a product of his shame and that his actions were inconsistent with that of a predatory rapist. The defense also challenged M.K.'s credibility by reminding the jury that she had admittedly gotten very intoxicated that night.

pen broke and leaked) was unbelievable versus the State's theory that the stain was M.K.'s menstrual blood.

With regard to the parties' arguments, there were no references to Appellant's claim that he only performed oral sex on M.K., and neither side argued that Appellant penetrated, or even attempted to penetrate, M.K.'s sexual organ by any other means than with his own sexual organ. The trial court's erroneous instruction had no impact on the arguments of the parties, and this factor weighs against a finding of egregious harm.

### II(4) — Other Relevant Information

Of course, the jury received more than the charge, the evidence, and the arguments of the parties. The jury also spoke with the parties in voir dire, and they heard opening statements before evidence began. While neither constitute evidence, they present opportunities to influence the jury to focus on particular issues and types of evidence and may have an impact on the jury's decision.

In voir dire, the State briefly touched upon means of penetration in its discussion about the full range of punishment by illustrating two different scenarios constituting sexual assault, one involving a finger and the other involving sexual intercourse.[11] However, the prosecutor made it clear

---

[11] Specifically, the prosecutor sought to explain to the venire that sexual assault is not necessarily "sexual in nature":

> I'm going to give you an example of what I'm talking about. . . . It was a high school baseball . . . team, a bunch of 17- and 18-year-old boys in a hotel room and they are hazing a newer member of the team and they – one of them stuck a finger up this young man's anus. You know, it wasn't sexual, they were just jacking with this kid because he was a new member of the team, right? Does that behavior meet the elements of sexual assault? Absolutely, it does. 17-year-old high school students doing that, wasn't sexual, just hazing a teammate. Sexual assault.
> On the flip side of that is you have somebody who has full-on sexual intercourse with somebody again[st] their consent or without their consent. Sexual assault; same crime.

that he was not referring to Appellant or this case and was only talking about the crime of sexual assault in general.

The defense voir dire began by asking the venire about the presumption of innocence and talking about the burden of proof. In explaining what the State was required to prove, defense counsel recited the allegations of the indictment, including that Appellant caused his sexual organ to penetrate the sexual organ of the alleged victim. But counsel immediately followed up by repeating that the State had to prove "without the effective consent of the victim" beyond a reasonable doubt, and "that's the big part. That's what [the prosecutor] said, and I think a lot of these cases boils down to consent."

In opening statements, the prosecution began by telling the jury that M.K. reported that she woke up to a stranger in her bed with his penis in her vagina. The defense's opening statement told the jury that Appellant had cheated on his wife but made no allusion as to how, whether it was by sexual organ, by mouth, or by any other means.

From our review of the record, although there was a brief mention during voir dire that sexual assault in general could be committed by means other than by sexual organ, the venire was not specifically told that "by mouth" could be one of those ways, and there was no reference during voir dire or opening statements by either party that Appellant used or tried to use any means other than his sexual organ. These parts of the trial do not weigh towards a finding of egregious harm.

### III — Conclusion

Considering the entire jury charge, the state of the evidence, the final arguments of the parties, and any other relevant information, we find that, even if the instruction for the lesser-included offense of attempted sexual assault that Appellant was convicted was erroneous, that error

did not affect the very basis of the case, deprive him of a valuable right, or vitally affect his defensive theory. While there was conflicting evidence as to whether Appellant penetrated M.K.'s sexual organ with his sexual organ or performed oral sex on M.K., the very hotly contested and argued issue was consent. The lawyers tried the case as a consent case, and from the start of trial until its conclusion, Appellant's defensive theory was he had a drunken but consensual encounter with M.K., and the prosecution theory was that Appellant took advantage of an overly intoxicated woman who did not consent to any sexual encounter. Defensive *theory* aside, the defense *strategy* was not to ask the jury to acquit because Appellant had committed a different act than what the State had charged him with. The defense strategy was to rehabilitate Appellant's credibility, challenge M.K.'s credibility, and focus on the failure to test supposedly inculpatory evidence which could have confirmed penetration and thus M.K.'s version of events, such as the sexual assault kit and especially the stain on Appellant's underwear that Vessell testified looked like blood and that the State had vigorously argued was M.K.'s transferred menstrual blood.

There may be some theoretical harm, but the record here does not show egregious harm. Therefore, we sustain the State's sole ground for review. The judgment of the court of appeals is reversed, and this case is remanded to the court of appeals to consider Appellant's remaining issues.

Delivered: December 20, 2023
Publish